**UNITED STATES of America, Appellee,**

v.

**Louis E. WOLFSON, Elkin B. Gerbert, Joseph Kosow and Marshal G. Staub, Appellants.**

**Nos. 717–720, Dockets 33326–33329.**

United States Court of Appeals, Second Circuit.

Argued June 13, 1969.

Decided Nov. 11, 1970.

William O. Bittman, Washington, D. C. (Hogan & Hartson, Austin S. Mittler, Carl L. Taylor and Stuart Philip Ross, Washington, D. C., of counsel), for defendant-appellant, Louis E. Wolfson.

Edgar H. Brenner, Washington, D. C. (Arnold & Porter, James E. Krier and Milton V. Freeman, Washington, D. C., of counsel), for defendant-appellant, Elkin B. Gerbert.

Simon H. Rifkind, New York City, (Paul, Weiss, Goldberg, Rifkind, Wharton & Garrison, Arthur L. Liman, Allan Blumstein and Edward R. Korman, New York City, of counsel), for defendant-appellant, Joseph Kosow.

Frank G. Raichle, Buffalo, N. Y. (Raichle, Banning, Weiss & Halpern, Buffalo, N. Y., of counsel), for defendant-appellant Marshal G. Staub.

Paul B. Galvani, Asst. U. S. Atty., New York City (Robert M. Morgenthau, U. S. Atty., S.D.N.Y., New York City, Douglas S. Liebhafsky, John H. Doyle, III, Ross Sandler and Charles P. Sifton, Asst. U. S. Attys., New York City, and Paul R. Grand, Special Asst. U. S. Atty., New York City, of counsel), for appellee.

Before MOORE, SMITH and ANDERSON, Circuit Judges.

MOORE, Circuit Judge:

The defendants Louis Wolfson, Elkin Gerbert, Joseph Kosow and Marshal Staub appeal from their respective convictions after a jury trial upon charges contained in a five-count indictment.

Count I alleged a conspiracy to violate specific enactments, namely, 15 U.S.C. §§ 78j(b), 78m and 78ff(a), 18 U.S.C. §§ 1505, 1621 and 1622, and Rules 10b–5 and 13a–1 promulgated by the Securities and Exchange Commission (SEC) under the Securities Exchange Act of 1934 (17 C.F.R. §§ 240.10b–5 and 13a–1).

Wolfson, Gerbert, Kosow and Staub (and Alexander Rittmaster who pleaded guilty, served as the principal government witness and who is not an appellant) were named as the conspirators. The conspiratorial acts charged were explicitly stated. They were:

(1) that in connection with the purchase and sale of common stock of Merritt Chapman and Scott Corporation (MCS), the defendants, using instrumentalities of interstate commerce, employed a scheme to defraud and engaged in a course of business "which would operate as a fraud and deceit upon the shareholders of Merritt Chapman and Scott Corporation.";

(2) that they would make and cause to be made false and misleading statements to the New York Stock Exchange and the SEC;

(3) that they, under oath, would testify falsely before the SEC;

(4) that they would suborn others to commit perjury; and

(5) that they would obstruct the proper administration of the law under which the case before the SEC was being conducted.

The means by which the defendants carried out the conspiracy are also specifically stated, namely, that

a. Wolfson, Gerbert and Staub would control MCS;

b. Wolfson, Gerbert, Rittmaster and Staub would cause MCS to purchase a substantial amount of its outstanding stock;

c. Wolfson, Gerbert, Kosow, Rittmaster and Staub would cause MCS to enter into agreements with Kosow whereby Kosow would purchase hundreds of thousands of shares of MCS stock on the open market and MCS would purchase such stock from Kosow at a fixed price substantially in excess of the market price at the time of the agreements;

d. Wolfson would personally guarantee this obligation;

e. Gerbert, Rittmaster and Kosow would open brokerage accounts in the names of Kosow and his nominees and purchase said stock on the New York Stock Exchange;

f. Wolfson, Gerbert, Staub and Kosow would cause MCS to purchase said stock from Kosow;

g. Wolfson, Gerbert, Kosow, Rittmaster and Staub would conceal such agreements and MCS's attendant liabilities from the MCS stockholders;

h. Wolfson, Gerbert, Rittmaster and Staub would fail to disclose said agreements to the SEC;

i. Wolfson, Gerbert, Kosow, Rittmaster and Staub would destroy the agreements to prevent their discovery by the SEC;

j. Wolfson, Gerbert, Kosow, Rittmaster and Staub would testify falsely under oath before the SEC in order to conceal the agreements; and

k. Gerbert and Kosow would influence witnesses before the SEC to testify falsely under oath.

Count II charged Wolfson with perjury in connection with his testimony before the SEC.

Count III charged Gerbert with perjury before the SEC.

Count IV alleged that Wolfson, Gerbert and Staub on April 30, 1963 caused a balance sheet to be filed with the SEC and the New York Stock Exchange as part of MCS's annual report of 1962 which was false and misleading in that it failed to disclose MCS's liabilities under the stock repurchase agreements.

Count V was the same as Count IV except that the filing date was April 30, 1964 and the report was for 1963.

Wolfson, found to have been guilty under Counts I, II, IV and V, was sentenced to imprisonment for eighteen months (concurrent) and to fines of $10,000 on each of Counts I, IV and V and $2,000 on Count II, with costs; Gerbert, eighteen months' imprisonment (concurrent) on Counts I, III, IV and V and fines of $10,000 each on Counts I, IV and V and $2,000 on Count III; Kosow, one year imprisonment and a $10,000 fine on Count I; and Staub, one year (concurrent) on Counts I, IV and V and fines of $10,000 each on Counts I, IV and V, execution of prison sentence suspended, probation one year.

## Pre-Trial Proceedings

Before trial Kosow, who was only charged with conspiracy in Count I, moved for a severance on the ground that a joint trial with his co-defendants, who were also charged with perjury, subornation of perjury and obstruction of justice in the substantive counts and who were officers of MCS, would greatly prejudice him and deprive him of a fair trial. The motion was denied. The decision did "not preclude the possibility that facts may develop which would compel a different result." (Cooper, D. J., April 11, 1967, 282 F.Supp. 772.)

Approximately a year later and before trial, Kosow again moved for a severance stating as a new development the conviction of Wolfson and Gerbert in the *Continental Enterprises* [1] case which might affect their willingness to take the witness stand in support of Kosow's defense. Staub made a similar motion in which Wolfson and Gerbert joined. In a lengthy opinion dealing with many pre-trial motions, 289 F.Supp. 903, Judge Palmieri denied the severance motions but said that "should prejudice become apparent during the course of the trial, the present disposition of the motions does not foreclose their renewal at trial for good cause."

## The Motion to Strike Count I

Prior to trial Wolfson and Gerbert moved to strike the conspiracy count (Count I) on the ground that the indictment as supplemented by the government's bill of particulars did not charge the commission of a crime under SEC Rule 10b–5. Again the motion was denied "without prejudice to its renewal upon the trial."

The court said: "Only the evidence at trial can spell out the duties of the defendants in connection with the alleged improper purchases and a determination of the validity of that aspect of the conspiracy dealing with Rule 10b–5 must necessarily await the trial."

## The Trial

The trial against Wolfson, Gerbert, Kosow, Staub and Rittmaster commenced on June 17, 1968. On June 19th Rittmaster pleaded guilty. The trial continued against Wolfson, Gerbert, Kosow and Staub, and ended on August 8, 1968.

Just as the first item of the conspiracy allegations and the first seven (a–g) means by which the conspiracy was carried out stressed the "fraud and deceit upon the stockholders of Merritt Chapman and Scott Corporation," so did the government's opening statement. Thus the jury were told with respect to the purchase of MCS stock by Kosow pursuant to repurchase agreements that "The charge is that [Wolfson, Gerbert and Staub] entered into contracts with this defendant, Mr. Joseph Kosow"; that as a result Kosow made over three million dollars; that "It was a fraud upon those stockholders who sold it to him not to be told that he [Kosow] had those contracts" enabling Kosow to sell at 50% higher prices; and that although it was not wrong for MCS to buy stock or make contracts with Kosow to do so "It was wrong for Mr. Kosow and the others not to disclose these contracts when they were buying the stock. That's what was criminal."

The major time portion of the long trial was consumed by the MCS stock purchase transactions which were developed at length through witnesses and exhibits. Little time was required for the perjury, subornation of perjury, obstruction of justice and the filing of false reports counts.

Before and during the trial many motions for severances and a mistrial were made by the respective defendants. All were denied.

At the end of the government's case the trial judge said to counsel: "In view of what has been said, the conspiracy count, insofar as it charges that the defendants conspired to violate Rule 10b–5 and 15 U.S.C. § 78j(b), is dismissed."

---

1. United States v. Wolfson, 405 F.2d 779 (2d Cir. 1968), cert. denied, 394 U.S. 946, 89 S.Ct. 1275, 22 L.Ed.2d 479 (1969).

This dismissal was qualified by the statement that "The dismissal of this part of the conspiracy count does not, however, require the dismissal of the entire count. The count charges, in addition to a conspiracy to violate Rule 10b–5, that the defendants conspired to obstruct justice, 18 U.S.C. § 1505, to commit perjury, 18 U.S.C. § 1621, and to suborn perjury, 18 U.S.C. § 1622. The fact that one of the objects of the conspiracy is removed does not invalidate the entire conspiracy charge."

When one of the defense counsel inquired, "Is the jury to be informed of your Honor's ruling with respect to Count I?", the Court replied, "They will in my charge but I do not propose to make any separation at this time." And when a motion was made by the defense to strike the evidence relating to the alleged stock fraud, the motion was denied, the Court saying, "I decline to make any statement to the jury at this time, but I will make an appropriate statement when the case is submitted to them." To counsel but not to the jury, the Court said, "Gentlemen, there is no issue about fraudulent stock sales here and there is no 10b–5 issue."

After all parties had rested and just before the jury was released for the day, the Court made a "brief statement" wherein it said that with respect to the four charges in the conspiracy count, "the only ones [securities laws] which are before you in this case, relate to the filing of periodic reports with the Securities and Exchange Commission setting forth, among other information, the financial statements of Merritt-Chapman & Scott Corporation."

Amongst other instructions, the Court said that the government conceded that "this case presented no issue with respect to the validity of a corporation's agreeing to repurchase its own stock." and that "[t]he defendants are not on trial for conspiring to cause Merritt-Chapman & Scott Corporation to repurchase [sic] its shares or to engage in repurchase agreements" but that "[o]ne of the central factual issues in the case" had to do with the repurchase agreements. This issue, however, was limited to the perjury, subornation of perjury and obstruction of justice issues, namely, "in the context of disclosure to the SEC as part of the information required by law to be furnished to the" SEC by MCS.

Similarly as to the Kosow purchases (ventures), the Court said that "[a]ny potential issue with respect to disclosure * * * has been taken out of the case by legal ruling, which I made after the government rested." To this extent the case had become "simplified and foreshortened." And as a final and pre-summation instruction to counsel, the Court said, "But what the case boils down to is really a case virtually before the SEC of subornation of perjury in the testimony. That is all it amounts to." These instructions were reiterated at the jury's request.

However, throughout the first four weeks, the trial had concentrated upon the Kosow and MCS stock purchases, the Kosow-MCS repurchase agreements, the participants in Kosow's purchase syndicates (referred to as "ventures"), the means and various nominees used to effect the purchases, the large profits to Kosow therefrom and the desire of all concerned to keep the purchases and repurchase agreements from the MCS stockholders and the New York Stock Exchange.

Digressing momentarily, it is impossible adequately to condense this record of twenty-three large printed volumes (over 6,800 pages exclusive of exhibits) and over 1,000 exhibits. However, an attempt must be made to try to state the MCS situation as it related to the acts of these defendants in the period 1960–65.

In the early 1960s as a result of an unusually disastrous year financially (1960), the common stock of MCS was selling on the New York Stock Exchange in a 8–12 dollar per share range. The book value was substantially higher. Under these circumstances it seemed advisable to Wolfson and his colleagues and advisors for MCS to purchase as much stock as possible at these levels.

However, because of restrictions against such purchases by MCS in its debt obligitation agreements with lending institutions, a plan was evolved whereby Kosow, not an officer or director of MCS, would purchase large quantities of MCS stock. This Kosow did either in his own name or in the names of various nominees and with money supplied by Kosow and his participants in these so-called purchase "ventures." At or about the same time MCS entered into agreements (sometimes referred to as "commitments") to purchase on or before certain dates in the future at a price of $18.75 a share the stock which Kosow and his associates acquired at much lower prices.

This plan obviously was designed to accomplish indirectly that which MCS could not do directly. The money to purchase came from Kosow and associates and not from MCS. The debt restrictions were thus in theory avoided. It was hoped that by certain financial adjustments by MCS in the not-too-distant future, these restrictions could be lifted and the Kosow commitments be honored.

The buying in of its stock by a corporation below book value is and has been recognized as a sound and legal practice and indulged in by many large corporations. However, in this case, there was a decided difference. The commitments to repurchase from Kosow placed MCS under a liability which affected its financial status as much as an outright purchase because MCS had given to Kosow and his associates, in effect, a guarantee to buy the stock purchased by him at a price some 50% above its purchase price. Naturally it was in the interest of the MCS officers and directors, who participated in the scheme, to conceal both purchases and repurchase agreements. They might well have subjected themselves to stockholders' suits (corporate waste and failure to give other stockholders an equal opportunity amongst others) and subjected themselves to violations of their debt agreements and to censure by the Stock Exchange and the SEC—all powerful reasons to avoid disclosure of the agreements. But none of these possibilities is in issue here.

Returning to the trial itself, a certain amount of backing and filling is required because it was not until the government had rested at the end of its case that defense counsel were advised that the charges in Count I relating to the purchase and repurchase transactions and agreements which had consumed some four weeks of trial time and had resulted in several thousand pages of testimony were virtually out of the case. Even then the jury were not told of this decision which was to be covered in the charge—two weeks later.

Thus, the jury for some four weeks had heard the stock purchase evidence in the light of the government's opening statement that "[t]he charge is [Wolfson, Gerbert and Staub] entered into contracts with this defendant, Mr. Joseph Kosow;" that Kosow bought over 700,-000 shares of MCS between $8 and $12 a share; that MCS bought the stock back at $14 to $19 a share; that Kosow made over $3 million dollars on the deal; and that [i]t was a fraud upon those stockholders who sold it to him not to be told that he had those contracts [the repurchase at $18.75]." But then the government conceded that it was not wrong for MCS to buy stock or to make agreements with Kosow. The wrong, it said, was "for Mr. Kosow and the others not to disclose these contracts when they were buying the stock. That's what was criminal."

Not for six weeks was the jury to know that quite apart from perjury, subornation of perjury and obstruction of justice was failure to disclose not criminal. It was only on July 23, 1968 (the trial commenced on June 17, 1968) that the Court read a brief opinion dismissing that portion of the conspiracy count which alleged a violation of Rule 10b–5, previously mentioned.

This statement brought forth defense motions to dismiss because of a material amendment of Count I, to strike all evidence relating to violations of Rule 10b–5, and for a mistrial because of com-

mingling of the evidence. The motions were denied.

The Court then told the jury for the first time that "[t]he defendants are not on trial for conspiring to cause Merritt Chapman & Scott Corporation to repurchase its shares or to engage in repurchase agreements;" that the only securities laws before them "relate to the filing of periodic reports" with the SEC; that the Kosow agreements and "ventures" were before them "in the context of disclosure to the SEC as part of the information required by law to be furnished" and "in connection with charges of conspiracy to commit perjury before the SEC, to suborn perjury * * and obstruct justice, that is, to destroy documents and suppress information;" that there was no issue as to whether the Kosow agreements should have been disclosed to the selling stockholders and that "[t]he case has thus to some extent been simplified and foreshortened." The Court then said that it would make a statement to the jury "taking 10b-5 out of the case, taking any question of the illegality with respect to the agreement out of the case. But what the case boils down to is really a case virtually before the SEC of subornation of perjury in the testimony. That is all it amounts to."

The problem of physically deleting the dismissed portions of the indictment (the conspiracy count) was resolved by the Court's placing over such portions opaque paper on which was written, "This portion of indictment stricken as a matter of law; it is not to be considered by the jury."

Despite the Court's comment at the end of the case that "[t]his case had a different architecture when it opened," and the government's statement that "the case is really as simple as Mr. Wolfson's answers to these two questions [the Wolfson denials of knowledge of the agreements on which the perjury count was founded]," the government's summation brought to the jury's attention the Kosow purchase ventures, the diversification of the purchase orders, the agree-

ments, their concealment from the stockholders and the fear of stockholders' actions. The summation ended with, "Basically it is a case of perjury, perjury and the crimes that necessarily go with perjury, subornation, obstruction, and I want to leave you with two questions and answers by Mr. Wolfson [the questions to which he denied any understanding with Kosow that MCS would buy back the stock]." Any substantive count of perjury, subornation of perjury or obstruction of justice against Kosow was apparently omitted because he had testified in Boston and not in the Southern District of New York.

*The Charge*

Although there had been declarations that the stock purchases and the agreements related thereto were out of the case (the Court said as to the coveredover part of the indictment that "these parts have been stricken by a legal ruling made by the Court and should therefore not be considered. They are no longer in the case."), the Court read to the jury as means by which the conspiracy was carried out seven paragraphs (7(a)–(g)) of the indictment. The substance was that Wolfson, Gerbert and Staub would control MCS; that they and Rittmaster would cause MCS to purchase a large amount of its stock; that they and Kosow would enter into agreements under which Kosow would purchase stock and MCS would repurchase from Kosow and his nominees the stock "at a fixed price substantially in excess of the market price at the time of the agreements;" that Wolfson would guarantee certain of these repurchase obligations; that Kosow would use nominees; that defendants would cause MCS to repurchase; and that defendants would conceal such agreements and the liabilities resulting therefrom from the MCS stockholders. Thus it would appear that the jury had before it the very material purportedly taken out of the case and upon which they could place a criminal connotation.

In summarizing the evidence, the trial court stressed the repurchase agreements

as very important (the "focal point"), the stock purchases, the Kosow ventures, and trouble with a stockholder named Singer but then, consistent with its rulings at the end of the case, reiterated that any possible fraud on MCS stockholders was not in issue and there was no contention that stock repurchase was an illegal act. Thereafter, light on the conspiracy count was focused on false 10-K statements, "perjury, subornation of perjury, [and] obstruction of justice."

This somewhat extended attempt to relive the trial by reviewing the record —particularly as to the comments and instructions to the jury in opening, summation and charge—has been deemed necessary in order properly to appraise the appellate arguments on behalf of the respective defendants.

*Kosow:*

Kosow was the only defendant not charged in a substantive court of perjury, subornation of perjury, obstruction of justice and filing false 10-K reports. He is linked to the other defendants in the conspiracy count. Error is asserted by the Court's refusal to dismiss the entire conspiracy count after dismissing the conspiracy-to-defraud portion thereof. This dismissal and the physical alteration of the indictment, Kosow argues, constituted an impermissible amendment and a material alteration of the indictment as returned by the grand jury. The government, in turn, claims that the elimination of the stock purchase part of the conspiracy does not affect the validity of the count as it relates to the other charges and, hence, is not an amendment, Overstreet v. United States, 321 F.2d 459 (5th Cir. 1963), cert. denied, 376 U.S. 919, 84 S.Ct. 675, 11 L.Ed.2d 614 (1964), and that since the removal of the stock purchase phase "did not broaden the charge, constitute a new charge or result in defendant's being tried under any accusation not returned by the grand

jury," Vincent v. United States, 337 F.2d 891, 895 (8th Cir. 1964), cert. denied, 380 U.S. 988, 85 S.Ct. 1363, 14 L.Ed.2d 281 (1965), Kosow must look to other grounds of prejudice than this reduction of the charges on Count I.

Alternatively Kosow contends that once the stock fraud charge was dismissed, the Court was under a duty to declare a mistrial or at least to advise the jury promptly that these charges had been eliminated. Although, in our opinion, the Court properly refused to declare a mistrial, failure to advise the jury promptly and to instruct them to disregard four weeks of evidence relating to the stock purchases presents a more serious problem.

In its opening statement, the government stated that Kosow had not revealed to the people who were selling the stock to him that he had "in his back pocket contracts to resell that very same stock to Merritt-Chapman at 50 percent higher prices, roughly. It was a fraud upon those stockholders who sold it to him not to be told that he had those contracts." During the next four weeks, the jury was subjected almost exclusively to proof of these Kosow purchases with the sinister implications of the use of various brokers and nominees to effect the purchases. The government thus concentrated heavily on fraud and Kosow's $3-million-dollar assured profit. Merely to instruct the jury at the end of the case and in the charge to disregard four weeks of proof directed to stock fraud was probably an exercise in futility exemplified by *Krulewitch* [2] and *Delli Paoli* [3] and finally resolved realistically by *Bruton*.[4] In short, no matter what instructions were given, it is more than doubtful that the minds of the jury could be wiped as clean as a blackboard or slate. Even had the Court earlier in the trial by the strongest instructions told the jury that the stock purchase

2. Krulewitch v. United States, 336 U.S. 440, 69 S.Ct. 716, 93 L.Ed. 790 (1949).

3. Delli Paoli v. United States, 352 U.S. 232, 77 S.Ct. 294, 1 L.Ed.2d 278 (1957).

4. Bruton v. United States, 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968).

fraud and four weeks of testimony thereon were to be expunged from their minds, this court would doubt (along with Mr. Justice Jackson and others) that such mental gymnastics would be possible. Whether instructions timely given would have enabled the jury to deliberate on the real questions ultimately posed by the Court and the government, namely, perjury, subornation and obstruction of justice, an appellate court will never know, but our developed concepts of a fair trial call for serious consideration of the likelihood of prejudice.

This discussion leads to the next issue raised by Kosow, namely, that he was denied a fair trial because of the denial of his many and continuous motions for a severance and a separate trial. His first claim of error is that by a joint trial he was prevented from calling as witnesses on his behalf his co-defendants Wolfson and Gerbert. This argument is most speculative. There was no certainty that either would have been called and greater uncertainty that their testimony would have been beneficial to Kosow.

■ However, Judges Smith and Anderson do not reach this point because they would not suggest severance as to Kosow since, in their opinion, proof of the joint action would justify admissibility on the trial of the conspiracy count of the evidence adduced on all counts. They rely, amongst other grounds, on evidence of Kosow's statements to Gottlieb from which they claim that inference could be drawn of Kosow's participation in the effort to conceal the commitments.

Far more damaging and prejudicial to Kosow was the Rittmaster testimony elicited against him and admissible only because of his joinder in the conspiracy. Conspiracy is always a prosecutor's favorite count whereby evidence otherwise inadmissible can be introduced "subject to connection" and as a binding statement by a co-conspirator. The connec-tion requirement—particularly in a long trial—is quickly forgotten but the memory of the testimony is carried into the jury room. In this case Kosow was highly prejudiced by testimony by Rittmaster not as to what Kosow had told him but by Rittmaster's testimony that Gerbert had told Rittmaster that Kosow had told Gerbert that Kosow would say in explanation of the stock repurchase agreements that Kosow had forged Gerbert's and Rittmaster's signatures and that his stock purchases were made possibly to gain control of MCS. In my opinion, in a separate trial such testimony would have been inadmissible and the statements attributed to Kosow would have had to be adduced by direct evidence with confrontation rights to Kosow.

Although all defendants in a joint criminal trial are subject to the danger of contaminating evidence introduced against co-defendants, the evidence introduced against Wolfson, Gerbert and Staub must have had a damaging effect on Kosow. There is no doubt as to Kosow's primary role in this financial drama. His purpose was to raise the money and buy the MCS stock which MCS, because of lending institutions' restrictions, could not itself buy. He undoubtedly participated in the endeavors to keep the repurchase agreements from the MCS stockholders and the lending institutions. But possible fraud against the stockholders eventually was eliminated from the case.

As to other alleged SEC violations there is no proof that Kosow was either an officer or director of MCS who might be responsible for the failure to put these "commitments" on the MCS books and to include them in the 10-K reports. Nor is there any proof that concealment and perjury were a part of Kosow's functions in the transactions. As in *Grunewald* [5] acts of covering up "cannot themselves constitute proof that concealment of the crime after its commission was part of the initial agreement among the conspirators." 353 U.S. at 402, 77 S.Ct. at

5. Grunewald v. United States, 353 U.S. 391, 77 S.Ct. 963, 1 L.Ed.2d 931 (1957).

972. But Kosow's crime was not the purchase and repurchase of MCS stock. The trial court so held. The misconceived need for perjury before the SEC did not arise for a long time later. If there were a conspiracy to perjure, suborn and obstruct, it might well have been a separate conspiracy.

■ Kosow objects to the Court's failure to allow full cross-examination of Rittmaster concerning his attempts to obtain a favorable SEC ruling on his desire to sell publicly $500,000 of MCS unregistered common stock. Defense counsel claim this curtailment prevented them from adequately showing Rittmaster's motive to falsify in the hope of gaining a government favor. My colleagues, Judges Smith and Anderson, believe that such curtailment constitutes reversible error as to all counts, and with respect to Count I, I am in agreement. My dissent on the other counts is based upon my belief that the Rittmaster testimony was not a material factor in the government's case on these counts. Discussion of this point is set forth hereinafter under the heading *"The Curtailment of Rittmaster's Cross-Examination."*

Kosow further complains of an alleged one-sided summary of the facts in the Court's charge and of the Court's attributing to Gerbert statements actually obtained via Rittmaster hearsay. These and other matters, including New York Shipbuilding and Universal Marion stock transactions and the Hellers' participation are important but not vital to the ultimate question: did Kosow receive a fair trial or was he deprived of a fair trial by being denied a severance and by being forced to be included with defendants who were found to be guilty of the crimes charged against them in the substantive counts. The concentration by the government on the stock purchase and repurchase aspects of the case for so many weeks, the elimination of this important phase without adequate notice to the jury, and a careful reading of the entire record leave a distinct impression that the cause of justice would have been better served by a severance as to Kosow. Such a severance would not have precluded the government from pressing its charges of conspiracy against him for perjury, subornation and obstruction but Kosow would then have been afforded an adequate opportunity to defend himself against these specific charges.

*Gerbert:*

Gerbert adopts the arguments made in the Kosow brief, namely, errors in the Court's refusal to dismiss the entire conspiracy count after deletion of the stock fraud portion and failure to advise the jury promptly thereof, refusal to declare a mistrial, curtailment of Rittmaster's cross-examination, the introduction of Rittmaster's guilty plea, failure to grant a severance and errors in the charge.

Although for the reasons already stated I concur in the reversal of Count I as to Gerbert, I dissent for the reasons hereinafter stated as to Counts III, IV and V, and would affirm the conviction on these counts. Judges Smith and Anderson would reverse on Counts I, III, IV and V.

*Wolfson:*

Wolfson relies on the Kosow brief as to dismissal of the conspiracy count, mistrial, failure to advise the jury promptly of the dismissal of the stock fraud charge, curtailment of Rittmaster's cross-examination and the introduction of Rittmaster's guilty plea. As in the case of Gerbert, Judges Smith and Anderson would reverse as to Counts I, II, IV and V. As to Counts II, IV and V, I dissent and would affirm the conviction.

*Staub:*

Staub adopts the points of his co-defendants as they affect his situation and stresses the lack of sufficient evidence to support a conviction on any of the Counts I, IV and V on which he was convicted, and urges that we follow the precept announced in United States v. Bufalino, 285 F.2d 408, 417 (2d Cir. 1960) that it is "especially important for trial and appellate courts to determine the suf-

ficiency of the evidence as to each defendant in mass conspiracy trials."

Staub with Wolfson and Gerbert was charged in two substantive counts with causing MCS to file false annual reports with the SEC for the years 1962 (Count IV) and 1963 (Count V). Stated briefly, Staub, according to the Government's theory, knew that MCS was committed to purchase some $5,000,000 of MCS stock from Kosow in 1962 and well over $8,-000,000 in 1963, and failed to include these "contingent" (so described in the indictment) liabilities in the MCS annual reports for these years. These contingent liabilities are frequently referred to as "commitments." The filing of such a report which is false and misleading as to a material fact is a crime. 15 U.S.C. § 78ff(a).

Staub was the President of MCS in 1962 and 1963. Although he was in charge of operations rather than finances, he must assume responsibility for the contents of these reports, if he had or should have had knowledge of any material omissions therefrom. Certainly items of such size must be regarded as material.

Staub, the only defendant who took the stand in his own defense, testified that he never knew of a Kosow repurchase contract at the times when the reports were filed. The government's factual inferences as to the year 1962 are quite inconclusive. Staub's recording on his so-called "stock-flow" chart of MCS's commitment as of April 1964 to purchase 110,000 shares at $18.75 a share (the commitment pursuant to the April 1, 1963 contract) is not proof of knowledge of an MCS commitment which should have been reported as of December 31, 1962. Nor was the information given to Staub on January 15, 1964 by the inquiring stockholder, Singer, of the $18.75 repurchase agreement related back to 1962. The failure of Staub to mention future stock purchase commitments to the MCS auditors in January 1964 before the filing of the 1963 10-K report does not establish knowledge in 1962. The government argues that "the jury was jus-

tified, in the light of his unquestioned knowledge of the commitment in April 1964, and on January 15, 1964, to infer that part of his concern in November [1963] related to the future commitment." This may well be but it does not permit an inference of knowledge of past (1962) commitments.

A different situation is presented as to Count V—the 1963 10-K report. When this report was due to be filed, Staub either knew, or had been put on notice, of the future commitments. Staub's contention that he did not personally sign, or participate in the preparation of, the reports is without merit. He had been MCS's Treasurer before he became President. Obviously, he knew of the matters which should be included in a financial report which truly reflected the company's position.

This view as to Staub's knowledge justifying, in my opinion, a conclusion of affirmance in his case as to Count V must also be regarded as a dissent because my colleagues believe that the curtailment of the Rittmaster cross-examination requires a reversal as to Staub of all counts against him.

### The Deletion of the Stock Fraud Charge from the Indictment

All defendants argue that the Court's dismissal of the stock fraud (Rule 10b–5) charge from Count I constituted such a material amendment of the indictment found by the grand jury as to require the dismissal of the entire conspiracy count. This claim must be tested against the background of the law on the subject.

Quite recently, the Ninth Circuit suggested "to the District Courts and to the bar that, for the present at least, the only safe course is never to amend the body of an indictment, either on its face or by order not carried out to the point of changing the face of the paper." Heisler v. United States, 394 F.2d 692, 696 (9th Cir. 1968), cert. denied, 393 U.S. 986, 89 S.Ct. 463, 21 L.Ed.2d 448 (1968).

In 1886 the Supreme Court in Ex parte Bain, 121 U.S. 1, 7 S.Ct. 781, 30 L.Ed. 849, dealt with an indictment as to which

the trial court in a false report case had stricken the name "Comptroller of the Currency" as the person intended to be deceived. The title of the governmental agent did not render the report any the less false but the Supreme Court said (121 U.S. at 7, 7 S.Ct. at 786): "The party can only be tried upon the indictment as found by such grand jury, and especially upon all its language found in the charging part of that instrument."

In 1919 in Dodge v. United States, 258 Fed. 300, 305, this court, even where no objection was taken by defense counsel to strike merely a portion of a paragraph of the first count of an indictment, said: "The rule is almost universally recognized, both in this country and in England, that an indictment cannot be amended by the court, and that an attempt to do so is fatal to a verdict upon that count."

In 1961 in United States v. Consolidated Laundries Corp., 291 F.2d 563, 571, we referred to this court's adherence in *Dodge* to the *Bain* principle but recognized that "some circuits have held the rule applicable only to amendments of substance and not amendments of form." A change of "form" in contrast to "substance" was noted by the Supreme Court in Russell v. United States, 369 U.S. 749, 770, 82 S.Ct. 1038, 1050, 8 L.Ed.2d 240 (1962), the Court stating, as to the rule in the federal courts, that "an indictment may not be amended except by resubmission to the grand jury, unless the change is merely a matter of form."

However, in Salinger v. United States, 272 U.S. 542, 47 S.Ct. 173, 71 L.Ed. 398 (1926) because of failure of proof, the trial court withdrew at the defendant's request certain of several plans to defraud without invalidating the indictment. Likewise in Overstreet v. United States, 321 F.2d 459 (5th Cir. 1963), cert. denied, 376 U.S. 919, 84 S.Ct. 675, 11 L.Ed.2d 614 (1964), there were separate and distinct legal consequences to a simple fact situation. The withdrawal of one of those consequences was held not to be an impermissible amendment of the indictment. Of a somewhat similar character is Thomas v. United States, 398 F.2d 531 (5th Cir. 1968). There the conspiracy was (a) to rob a bank and (b) to jeopardize life by the use of a bomb. The government itself moved to strike the second objective, which motion was granted.

In the light of these decisions, into what category does this case fall? There can be no doubt as to the materiality of the stock fraud charge. It was stressed as the first object of the conspiracy. The first seven "means" alleged related to the stock purchase fraud. The government in its opening said, "That's what was criminal." The major portion of the government's case was devoted to fraud. And elimination of this object of the conspiracy was kept from the jury until the end of the case. Even then the evidence was not stricken or the effect of the elimination adequately conveyed to the jury. Furthermore, the conspiracy, if any, to conceal the stock purchase agreements was quite distinct from a conspiracy to commit perjury, suborn perjury or obstruct justice, the occasion for which did not arise for some time after the stock purchase, namely, not until the SEC investigation commenced.

In an endeavor to decide between complete dismissal as would be justified under certain decisions and retaining the indictment, as deleted, which might be justified under others, just as the modern trend is against legalistic technicalities in pleading, so retention of the indictment should be effected, if possible. However, retention does not remove the prejudice the defendants suffered on the trial because of the amendment. This prejudice is particularly true as to Kosow who was not charged with perjury, subornation, obstruction or false filing. Upon any new trial to be held based upon the amended indictment, Kosow's position would be radically different. The testimony of his participation in the purchase ventures, his large $3-million-dollar profit therefrom, his use of nominees (not shown to be unlawful), his use of relatives as brokers (certainly not an abnormal practice) and, particularly, the

Rittmaster hearsay against him, all combined to deprive him of a fair trial on the only issue remaining in the conspiracy count. Prejudice also existed as to Wolfson and Gerbert. Staub, too, was also prejudiced in the conspiracy count by the stock fraud proof.

## The Curtailment of Rittmaster's Cross-Examination

Concerning the importance of Rittmaster's testimony in obtaining a conviction, the prosecutor expressed the doubt whether "the government could have obtained a conviction in the matter, without the cooperation of Rittmaster." In fact, the Court even charged the jury that "a conviction on the basis of his [Rittmaster's] testimony alone would be entirely proper." His testimony related particularly to the conspiracy count and was most damaging as to Kosow. Thus all testimony which might have affected Rittmaster's credibility was vital to the defense.

Rittmaster's willingness to commit perjury and subornation of perjury had been established in the *Duncan Parking Meter* case in which he had been convicted on his guilty plea. However, the defense wished to show his motive in this case to continue his perjurious habits for his own advantage.

In September 1966 and prior to his grand jury testimony Rittmaster desired to sell publicly $500,000 of unregistered MCS stock. To do so he required a "no-action" letter from the SEC which governmental agency was very much involved in this case. Defense counsel had in their possession (pursuant to subpoena) correspondence between Rittmaster and the SEC on the subject. To Rittmaster's request (September 6, 1966) for such a letter, the SEC replied (September 30, 1966) that in view of the grand jury investigation then being conducted, it could not give an opinion at that time. However, on October 24, 1966 after Rittmaster had testified favorably for the government and the indictment had been returned, his attorneys again requested such a letter and on December 5, 1966, he received from the SEC the permission desired.

In this interchange of correspondence, defense counsel would have had the material from which they could have argued to the jury that this was Rittmaster's reward and was the motive for his testimony against the defendants. But when defense counsel sought to attack Rittmaster's credibility with this material, the prosecution's objection was sustained. Even the correspondence from which the motive argument could have been made was excluded by the Court. The Court felt that it would show a "relatively minor, esoteric manifestation of prejudice," that it would "unduly prolong this trial" (the letters could have been marked in a few minutes), and that it would "complicate the already complicated issues of this trial with a peripheral and complex question, all for the purpose of showing a possible lack of credibility." Although the Court said that the case "just abounds with opportunities for attacking the credibility of this witness [Rittmaster]," there had been no opportunity so directly to challenge his motives for giving his specific grand jury and trial testimony. The testimony and the reward therefor were virtually contemporaneous. The *Duncan Parking Meter* case established Rittmaster's willingness to commit perjury; the excluded correspondence would have established a motive to continue that practice in this case. Furthermore, the defense was deprived of an opportunity to answer the government's argument that Rittmaster actually suffered a financial detriment by surrendering his $100,000 MCS salary by arguing that his testimony had enabled him to receive $500,000.

In criminal cases especially, defense counsel should be given great latitude in adducing proof which might bear on credibility. As said in Harris v. United States, 371 F.2d 365, 367 n. 1 (9th Cir. 1967), "If the information sought reflected adversely upon the credibility of the witness, the government had no legitimate interest in suppressing it."

See also United States v. Padgent, 432 F.2d 701 (2d Cir. 1970).

The government argues that to have admitted the correspondence would have opened a "Pandora's box" of collateral matters including questions of law as to what constituted a "controlling person" of MCS. But the trial judge could have kept the issues within reasonable bounds. In fact, the correspondence and a few questions to Rittmaster might have sufficed. Rather than cut off the line of inquiry completely, in a criminal case greater liberality would have been warranted. As the Supreme Court said in Alford v. United States, 282 U.S. 687, 694, 51 S.Ct. 218, 220, 75 L.Ed. 624 (1931), "The trial court cut off in limine all inquiry on a subject with respect to which the defense was entitled to a reasonable cross examination. This was an abuse of discretion and prejudicial error."

The importance of Rittmaster's credibility was also evidenced by the charge that "[i]ndeed, if you are certain in your own minds that he is telling the truth, a conviction on the basis of his testimony alone would be entirely proper with respect to Counts I, IV and V. Those are the non-perjury counts."

As to the effect of this curtailment there is a decided divergence of opinion in my views and those of Judges Smith and Anderson who believe that the Rittmaster testimony must be considered as affecting the jury's verdict as to all defendants on all counts and that the curtailment of his examination together with the trial court's comments that a conviction on the basis of his testimony, if believed, would be proper as to Counts I, IV and V constitutes reversible error.[6]

---

6. For instance they point out that included in Rittmaster's testimony were statements to the effect that:

1. Wolfson was the chief policy maker for MCS; Gerbert was his right-hand man.

2. Wolfson told him to find out about Singer and since there had to be a leak which got to Singer, he wanted to look into it further.

3. Wolfson asked if the Hellers would buy debentures and stock for later resale to MCS. Gerbert checked with Wolfson about an early termination of the 1962 Heller agreements.

4. Wolfson, Gerbert and Rittmaster met in Florida in February, 1964; Wolfson asked them to get some buying in N. Y. Ship stock to get the price up from $12 so that they could get a public purchaser of the Kosow shares at the commitment price of $26.50.

5. In mid-1965 Wolfson told Rittmaster that he had to give Kosow some personal notes to cover some of the money MCS owed him. In later 1965 Wolfson said he was annoyed at the number of venturers Kosow had (presumably because of the increased danger of leakers) and at his having to give Kosow personal notes.

6. In February, 1966, in Miami, Wolfson told Rittmaster not to worry about the SEC because the worst would be a slap on the wrist if Wolfson had to go personally to "the Hill."

7. Gerbert referred on three occasions to Wolfson's purported reasons for actions (e. g., not tendering his shares to MCS because of tax problems) as flimflam or nonsense.

8. There was an MCS meeting in December, 1964, after the SEC investigations began, where Gerbert, Staub, Glickstein, Rittmaster and Wolfson discussed destruction of documents (all copies of repurchase contracts, Staub's stock purchase sheets, and the memorandum sent in response to Singer) relating to the Kosow commitment.

9. In April, 1962, Gerbert gave Rittmaster an order to buy 5,000 MCS shares from Kosow saying it was under the same agreement as was being worked out with the Hellers.

10. In May, 1962, Gerbert told Rittmaster that a particular broker's increased holding in MCS shares was for Kosow.

11. In 1962, Gerbert arranged for Kosow to buy from the Hellers since MCS could not pay the committed price of $26/share.

12. Gerbert, Rittmaster and Kosow in the fall of 1965, during the SEC investigations agreed to describe the agreements as a "put and call" or straddle order, which was false.

13. Gerbert suggested that the leak to Singer came from Kosow's group.

14. Gerbert and Rittmaster tried to raise the MCS stock price to $18.75

Thus, my colleagues would reverse and remand for a new trial on all counts because they believe that the Rittmaster testimony was or may have been responsible for the convictions on all counts.

As to Count I, I am in complete accord. However, to me it is so abundantly clear that the Wolfson and Gerbert perjury (Counts II and III) before the SEC was so completely unrelated to Rittmaster's testimony that I must dissent from a reversal as to Counts II and III with respect to perjury and from a reversal as to Wolfson and Gerbert with respect to Counts IV and V, which counts relate to alleged false balance sheets, and would hold that Rittmaster's testimony as to the existence and concealment of the commitments was not essential for the verdicts on the substantive counts of perjury and material omission.

On any new trial, I am satisfied that all the elements essential to satisfy Counts II and III can be introduced without any reference to Rittmaster. The perjury here proved in my opinion depended upon one or two direct questions with equally direct answers which the jury was entitled to find to have been knowingly false.

Likewise as to Counts IV and V, I believe that guilt was established independently of Rittmaster's testimony.

For the following reasons, therefore, I would affirm the convictions of Wolfson and Gerbert as to the perjury Counts II and III.

Counts II and III are the substantive perjury counts against Wolfson and Gerbert. The facts establishing the perjury are quite simple. There was ample evidence, quite independent of Rittmaster, proving that Wolfson and Gerbert were familiar with the stock purchase agreements, contracts, arrangements or commitments. The term used is unimportant. Nor does it make any difference as to whether all the niceties of corporate authorization and signatures had been observed. On December 3, 1964 Wolfson testified under oath in New York in part as follows:

Q. Did you ever enter into any agreement with either Mr. Kosow or Mr. Sherman whereby you or the company would repurchase Merritt shares which they might own at a particular guaranteed price? A. I don't remember any such agreement.

Q. Do you know, sir, if any other officer of [sic] director of Merritt-Chapman, to your knowledge, ever entered into any such agreement with either Mr. Kosow or Mr. Sherman? A. Not to my knowledge.

Q. Mr. Wolfson, was there any understanding between you or any other officer of the company and either Mr. Kosow or Mr. Sherman that if either Mr. Kosow or Mr. Sherman went into the market and bought Merritt-Chap-

to avoid MCS private purchase from Kosow.

15. Gerbert told Rittmaster to tell the SEC that Kosow, not Gerbert, placed most of the orders for MCS stock, and he told him it would be good not to mention to the SEC the repurchase agreements.

16. Gerbert said that Kosow had gotten his people into line (in connection with telling the proper story to the SEC), that Parvin (a Kosow venturer), was a "stand-up guy," and that Sherman's copy of the repurchase contract had been retrieved and destroyed.

17. Staub destroyed his stock purchase sheets which he kept which contained notations corresponding to the Kosow purchases.

18. Staub was worried about the Singer affair and concerned about the accuracy of Singer's information.

19. Gerbert, Staub and Rittmaster met about making an offer to Simmons to buy at $18.75 to cover up purchases from Kosow.

20. In early 1966, Staub arranged for the Central National Corp. to buy $25,000 shares of N. Y. Ship from the Hellers.

21. Staub gave Rittmaster a letter from the SEC to Kosow's lawyer.

22. Gerbert told Rittmaster the need to conceal the commitments from shareholders, lending institutions, and the public since it would be embarrassing to publicize their dealings with friends, and because of losses by shareholders.

man stock, the company would buy it back from them? A. No, sir, to my knowledge or memory, I can't conceive of anything like that.

Q. You never heard any suggestion of any such understanding? A. Not to my knowledge, no.

Then in answer to a question directed to any understanding "that if and when Kosow were to purchase Merritt-Chapman & Scott in the open market, eventually Merritt-Chapman & Scott Corporation, or you, or corporations controlled by you would take such stock off his hands at higher prices?", Wolfson answered:

Well, I've never had any understanding with Mr. Kosow or anyone else that [sic] sold Merritt-Chapman stock, of any arrangements or deal like this. I've never authorized anyone—I never heard of anyone.

Wolfson argues that he was examined on short notice, that he was confused and that he was the victim of stenographic errors in the transcript of his SEC testimony. These, however, were jury questions. The jury was clearly justified in concluding that these answers were false and that his motive to conceal the agreements from the SEC was as strong as his desire to keep them from the stockholders.

Wolfson raises three defenses to his perjury conviction:

(1) The trial court refused to instruct on and marshal the evidence for what Wolfson calls a "principal defense," which was based upon his claim that the agreements with Kosow, *et al.*, were not "legally binding" agreements. However, the question as put to Wolfson by the SEC was not framed in terms of a binding agreement, and should be read to encompass the "understandings" Wolfson had with Kosow even after the binding agreements were "rescinded." Thus, the defense was no defense at all to the charge in the indictment and the requested charge could only have served to confuse the jury. Since there was no evidence at all that Wolfson intended his response to the question to refer only to legally binding agreements, there was no question for the jury and the charge was properly refused.

(2) Denial of pre-trial access to the government witness, Arthur Goldman. Goldman was one of two SEC lawyers who questioned Wolfson during the hearing before the Commission. Apparently he asked the question to which Wolfson responded falsely. The minutes of the hearing do not reflect Goldman's presence, and Wolfson claims that his lawyers did not even realize Goldman was present at the hearings until they began to investigate the perjury charge. When they sought an interview with Goldman, the SEC lawyers communicated with the prosecutor, who advised him to refuse to give any information to Wolfson's men. The reason given by the prosecutor was that he and Wolfson's attorneys were working on an agreement to stipulate the accuracy of the hearing minutes and he didn't wish to muddy the water. When the stipulation negotiations broke down, according to the prosecutor, the restriction on Goldman evaporated, but Wolfson's attorneys made no further attempt to talk to Goldman. Goldman was also made available to them during the trial, for purposes of preparing cross-examination material, but the defense did not take advantage of the opportunity. Wolfson argues that Goldman was a "key" government witness and that prejudice from the Government's obstruction of access to him should be automatically inferred. The record belies this contention. The reporter, who took the notes relied upon by the government, was available to the defense at all times, and Goldman was put on the stand simply to explain the absence of his name from the official record of the hearing. The defense's failure to take advantage of the opportunity to interview him during the trial negates their contentions regarding his importance, and reversal for the obstruction is not required absent a showing of prejudice, which is not made out on the record. See United States v. Miller, 381 F.2d 529, 538 n. 7 (2d Cir. 1968).

878

(3) The government failed to prove that Wolfson knew of any agreements outside the so-called Temkin agreement, and that the question directed at him only explored his knowledge of agreements with Kosow and Isidore Sherman. There was adequate evidence from which the jury could have found that Wolfson knew of the agreements or "understandings" with Kosow, and in view of his broad disclaimer of knowledge of agreements with "anyone," proof of knowledge only of the Temkin agreement (Government's Exhibit 1) would suffice to sustain the perjury conviction.

As to Count III in which Gerbert is directly charged with perjury, he argues that the one question out of 870 asked— "Other than these Goldberg agreements, and I don't mean to characterize them, do you know of any other agreement whereby Mr. Wolfson arranged with another person to buy Merritt-Chapman stock?"—was so ambiguous that his answer "Not to my knowledge" will not support a perjury conviction. Gerbert now claims that the question did not refer to the Kosow agreements but only to other joint venture agreements. Although Gerbert's understanding of the question is wholly subjective "absent fundamental ambiguity * * * the question of what a defendant meant when he made his representation will normally be for the jury." United States v. Diogo, 320 F.2d 898, 907 (2d Cir. 1963). See also United States v. Marchisio, 344 F.2d 653, 662 (2d Cir. 1965).

The jury had ample evidence from which to form an opinion of Gerbert's understanding. Gerbert had been vitally connected with the Kosow stock purchase plan. He had evidenced a desire that the repurchase agreements be kept secret and had urged others to lie to the SEC so that the agreements would not come to its attention. Since the jury had an opportunity to gauge Gerbert's veracity as to his understanding or misunderstanding of the question, its conclusion that he understood it to refer to the Kosow agreements and wilfully lied must be accepted. The notes relating to the questions made by Gerbert's counsel during the SEC examination were properly excluded by the trial court. Their understandings were not Gerbert's.

Wolfson and Gerbert launch a strong attack on their convictions on Counts IV and V (filing false MCS 10-K reports for 1962 and 1963) by asserting (1) there was no duty on the part of MCS to disclose the Kosow stock commitments; (2) even if there were, the duty was lodged in the MCS Treasurer—not in Gerbert or Wolfson; and (3) that these defendants had no actual knowledge that omission of the Kosow commitments would render the 10-K reports false and misleading.

Wolfson and Gerbert had personal knowledge of the Kosow commitments through their own personal participation in many of the venture operations. Their interest in concealing these commitments from public exposure was adequately established. The jury might well have inferred that they had the same interest in keeping these items from appearing on the MCS 10-K and annual reports.

Wolfson's and Gerbert's reliance upon an alleged failure of the MCS accounting firm to advise them that the Kosow commitments should be reported to the SEC does not protect them. Quite apart from SEC statute or regulation or even the niceties of "good accounting practice," the duty of disclosure should have been quite obvious under the circumstances. Both the SEC and the public were entitled to know that MCS's contractual liabilities were over $13 million (some $5 million and $8.4 million) greater than reported. It might well have been unnecessary to report every obligation to repurchase employee shares but commitments of $13 million were certainly material and their omission presented a false and misleading financial picture. Nor can Wolfson and Gerbert escape liability because they did not personally sign the reports.

Wolfson's and Gerbert's claim of error in the denial of their application for a severance made after the trial was well

advanced is not well founded. The application was premised upon their contention that on a separate trial they could have called Kosow as a witness. However, there was no assurance of what Kosow would have said or whether the purported rescission of the April 1, 1963 agreement would have been material. In any event the vague possibilities which might have arisen were not such as to acquire a severance upon this ground.

In conclusion, after a careful review of the entire record, the indictment and the amendment thereof, and the curtailment of the Rittmaster testimony, Judges Smith and Anderson find that the interests of justice would be best served by reversing the convictions of all defendants as to all counts, and I, for the reasons herein set forth, would reverse as to all defendants on Count I, affirm as to Wolfson on Counts II, IV and V, affirm as to Gerbert on Counts III, IV and V, and reverse as to Staub on Count IV and affirm on Count V.