**UNITED STATES of America,
Appellee,**

v.

**Lowell M. BIRRELL, Appellant.**

**No. 951, Docket 35191.**

United States Court of Appeals,
Second Circuit.

Argued June 2, 1971.

Decided Sept. 8, 1971.

Robert L. Clare, Jr., New York City (William B. Pennell, Allin C. Seward, III, and Elliot A. Taikeff, New York City, of counsel), for appellant.

John M. Walker, Jr., Asst. U. S. Atty. (Whitney North Seymour, Jr., U. S. Atty. for Southern District of New York, John H. Doyle, III, Walter M. Phillips, Jr., and Jack Kaplan, Asst. U. S. Attys., of counsel), for appellee.

Before CLARK, Associate Justice,[*] SMITH, Circuit Judge, and ZAVATT, District Judge.[**]

J. JOSEPH SMITH, Circuit Judge:

Defendant Lowell M. Birrell appeals from a judgment of conviction entered after a jury trial in the United States District Court for the Southern District of New York (Frederick van Pelt Bryan, Judge). He was found guilty of transmitting in interstate commerce wire communications for the purpose of executing a fraudulent scheme, in violation of 18 U.S.C. § 1343. Defendant was sentenced to two years imprisonment. He had also been indicted on one count of conspiracy to commit wire fraud and on another count of wire fraud, but a verdict of acquittal was directed on both counts by the trial court. We find no error and affirm the judgment.

The thrust of the government's charge against Birrell was that he had "issued" unauthorized stock certificates in a virtually defunct public corporation, which he caused to be pledged as collateral for a bank loan, misrepresenting the certificates as genuine. According to the government's case at trial, Birrell in 1965 became interested in acquisition of Drug Products Company, Inc., an inactive manufacturer of drug products. At the time there were 1,000,000 shares outstanding, 735,662 owned by Hugh Begley and the rest owned by members of the general public. Birrell allegedly approached Gerard A. Re and his son, Gerard F. Re ("Re") and the three agreed to purchase the Begley shares. The group enlisted Charles Dressen, baseball manager and friend of the Res, to make the purchase. Re arranged an advance of funds from his cousin, Peter Borre, to Dressen totaling $35,000, most of which was used to purchase the shares. Dressen delivered the shares to Re.

In April of 1966, three months after the acquisition, Birrell went to the company's offices and obtained a Drug Products stock book containing unissued certificates. Birrell desired to obtain a bank loan, using 100,000 shares as collateral. He had Patricia Livermore, a friend, contact Lawrence Davis, a vice-president of the First National Bank of Cincinnati, who agreed to lend her $5,-000 on the security of 100,000 shares of Drug Products and 100 shares of anoth-

* Retired Associate Justice of the Supreme Court, sitting by designation.

** Senior District Judge for the Eastern District of New York, sitting by designation.

er company. Mrs. Livermore agreed to turn over the proceeds to Birrell. The bank received the 100,000 shares, which had been removed from the stock book taken by Birrell. The shares were made out in the name of C. Whitney, a former houseboy and handyman for Birrell who had become Birrell's personal secretary. They had been endorsed in blank with the name Carter Whitney. The issuance of these shares had never been authorized, and therefore, argued the government, they were entirely worthless, a fact obviously not known by the bank which had accepted them as collateral. Davis wired the $5,000 to Mrs. Livermore in New York.

In its summation to the jury, the defense argued that Birrell was unaware of what Whitney was doing, and that any criminal activity had been performed solely by the latter. The only evidence introduced by the defense at trial was the stipulated testimony of Re's attorney that he had seen documents indicating that $35,000 had been withdrawn from a Swiss bank account maintained by the Res about the time of Dressen's purchase of the Begley shares. On appeal, Birrell alleges the commission of a number of errors at trial.

## I.  Right of Confrontation:

█ Birrell contends that he was denied his Sixth Amendment right of confrontation when Re refused to answer questions on cross-examination on the basis of his Fifth Amendment privilege against self-incrimination. Re had appeared as a witness for the prosecution, testifying that Birrell owned none of the stock of Drug Products and that it was all owned by Dressen, who had received his money from Re's cousin, Borre. On cross-examination, the defense attempted to ask Re about his Swiss bank account. Specifically, the questions were the following:

"Did [the services rendered by Borre] include maintaining or taking care of any European bank accounts for you?"

"Is it not true, sir, that * * * in January of 1966, you had more than $1,000,000 in a Swiss bank?"

"Does Dr. Lanz take care of your Swiss banking accounts?"

The defense was apparently attempting to establish that it was not Borre's money given to Dressen to purchase the Begley shares, but rather his own, out of his Swiss bank account. Why such a showing would be at all helpful to Birrell, save perhaps for its impeachment value since Re had denied that his funds were involved in the purchase, is unclear.

Birrell argues that the defense's contention was that Whitney or Birrell through Whitney in fact owned 25% of the former Begley stock by virtue of the four-man joint venture agreement between the Res, Dressen and Whitney, entered into in contemplation of obtaining the Begley stock. Since Birrell was entitled to one-quarter of the shares, the loan collateral was not worthless, the argument maintains. The most that could be said is that the shares were slightly irregular, since they had not been officially authorized at the time. This, Birrell contends, was only a minor technicality. We need not consider the government's suggestion that this theory was never presented at trial and indeed was inconsistent with the defense claim that Whitney was alone responsible for any criminal activity, Birrell being totally unaware of his actions. Nor is it necessary to accept the government's position that the mere fact of Birrell's participation in the four-man joint venture agreement does not automatically entitle him to one-quarter of the shares unless the agreement so dictates. The simple fact of the matter is that the questions posed to Re bore no relevance whatsoever to the theory Birrell now argues was the justification for posing the questions. Whether the money advanced to Dressen came from Borre or from Re in no way determines whether Birrell had a legitimate legal right to the shares. See, United States v. Car-

dillo, 316 F.2d 606, 611 (2d Cir.), cert. denied, Margolis v. United States, 375 U.S. 822, 84 S.Ct. 60, 11 L.Ed.2d 55 (1963), holding that a refusal by the trial court to strike the testimony of a witness who on cross-examination took his Fifth Amendment privilege when asked about collateral matters was not error. Since the most that the answers to the defense questions could have produced was impeachment of credibility on matters not directly in issue at trial, the questions concerned collateral matters, and there was no error in excluding them. It is true that the federal conviction will be reversed if the right of the defendant to cross-examine is unreasonably limited, see, e. g., United States v. Masino, 275 F.2d 129 (2d Cir. 1960), but the minimal prejudice possibly caused to defendant in this case would not constitute grounds for reversal, even if we found error in the ruling.

## II. *Variance of Proof From Bill of Particulars:*

■■ The government indicated in its bill of particulars that it would show at trial that the person who transmitted the stock certificates to the bank in Cincinnati was Patricia Livermore. At trial, the government introduced no direct proof on the issue, and the only inference established was that Birrell himself had caused the stock certificates to be transmitted to the bank. Thus it appears that there was a variance from the bill of particulars.

A variance from the bill of particulars, however, will invalidate a conviction only if real prejudice has been caused defendant as a result. See, e. g., United States v. Burgos, 269 F.2d 763, 767 (2d Cir. 1959), cert. denied, 362 U. S. 942, 80 S.Ct. 808, 4 L.Ed.2d 771 (1960); United States v. Albanese, 224 F.2d 879, 882 (2d Cir.), cert. denied, 350 U.S. 845, 76 S.Ct. 87, 100 L.Ed. 753 (1955). In the present case, defendant has failed to demonstrate the existence of the requisite prejudice. Birrell claims that if he had had notice of the government's intention to stand on the inference that Birrell himself mailed the stock certificates to the bank, he would have cross-examined government witnesses in an attempt to refute this inference. We fail to see, however, how defendant's cross-examination of witnesses would have varied if he had been made aware of this method of proof originally. Absent a showing by defendant of how his questioning would have differed, we must conclude that he has failed to establish the existence of the necessary prejudice.

## III. *Admission of Evidence of Similar Acts:*

Birrell contends that admission into evidence of testimony concerning the so-called Durham-Schneider and Lieberman frauds were irrelevant and unduly prejudicial. The evidence was admitted by the trial court as evidence of similar acts tending to establish Birrell's criminal intent. The Lieberman fraud provided the basis for the third count, charging wire fraud, upon which Birrell was indicted, but which was subsequently dismissed by the trial court.

According to the government's evidence, in March, 1966, Birrell attempted to interest Jesse Livermore, husband of Patricia Livermore, in purchasing Drug Products stock. Though Livermore himself had no interest in the stock, he agreed to discuss the matter with his friends, and subsequently interested Robert Durham, a friend, and Fritzi Schneider, Livermore's sister-in-law, in making purchases. Later that month Livermore delivered to Birrell two $1,000 checks payable to C. Whitney, in payment for the shares purchased by Durham and Schneider. Birrell then obtained from Re over 200,000 shares ostensibly for the purpose of showing them to prospective purchasers. Birrell turned over 20,000 shares to Livermore for Durham and Schneider, though Re had not authorized him to make any sales. When Re demanded the shares, Birrell falsely represented to Livermore that there had been a refinancing of Drug Products and the certificates given

to Durham and Schneider had to be replaced. Birrell then transferred to Livermore for delivery to the two purchasers 20,000 shares of Drug Products stock in the name of C. Whitney, taken from the same stock book used in the bank fraud for which Birrell was convicted.

The Lieberman fraud concerned the sale of 10,000 shares from the same stock book to one Anthony Lieberman. Birrell was paid the $2,500 purchase price in three installments with the last payment on April 27, 1966, according to testimony presented by the government. The shares involved in this transaction were also issued without authority and therefore were allegedly worthless.

■■■ Evidence of similar acts in fraud cases may be introduced where knowledge or intent is at issue, to give rise to an inference of knowledge or intent, or where the actual making of the misrepresentations is at issue, to establish the existence of a larger continuing plan or design. United States v. Freedman, 445 F.2d 1220 (2d Cir. 1971). C. McCormick, Law of Evidence, § 164 (1964). As to the first category, "[t]his inference does not require that the other representations should have been identical in purport nor made under precisely like circumstances." *Id.* In the present case, given the apparent existence of alternative defense theories, both categories are relevant. If the defense contention that Birrell knew nothing of any wrongdoing and it was only Whitney who was involved in any criminal activity is considered, the second justification for the admission of evidence of similar acts is relevant. If, on the other hand, we take into account the defense theory, argued on appeal, that Birrell was in reality owner of one-quarter of the shares by virtue of his participation in the four-man joint venture arrangement, and thus was acting in totally good faith in using the shares as collateral for the loan, then the former justification serves as a proper basis for admitting the evidence of similar acts. Contrary to defendant's contentions,

these transactions were not wholly irrelevant. A jury could properly conclude that they evidenced both a common plan to defraud individuals by means of the transfer of unissued Drug Products stock, and a criminal intent to defraud on Birrell's part.

Birrell further argues that the similar acts are inadmissible, since the government failed to prove even the fraudulent act under indictment, namely Birrell's transfer of the shares to the Cincinnati bank. It is clear, however, that the jury could properly have inferred that it was Birrell himself who mailed the stock certificates to the bank. There was evidence that Birrell had arranged for the loan through the Livermores, that Mrs. Livermore had requested the loan, and that the shares were received by Mr. Davis at the bank.

In arguing against admission of the similar acts evidence of the Lieberman fraud, Birrell relies heavily upon this court's decision in United States v. Wolfson, 437 F.2d 862 (2d Cir. 1970). There the trial court had dismissed a count for violation of Rule 10b–5, telling counsel that "there is no issue about fraudulent stock sales here and there is no 10b–5 issue." 437 F.2d at 866. Nevertheless, the trial court read to the jury in his charge seven paragraphs of the indictment, including much of the stricken material, to illustrate the means used to carry out the conspiracy. This court, in commenting on that practice, noted: "Thus it would appear that the jury had before it the very material purportedly taken out of the case and upon which they could place a criminal connotation." 437 F.2d at 868.

It is true that in this case, the jury was permitted to hear evidence on a count already dismissed. However, here the court dismissed the Lieberman fraud count solely for failure to establish connection of the telephone call with the fraud. In *Wolfson,* on the other hand, the count was dismissed for lack of substantive proof of criminal conduct, but the evidence was before the jury without sufficient instruction that the conduct,

non-disclosure, was not in itself criminal.

Moreover, if there had not been a third count, there would be no question of the right to introduce evidence of the Lieberman fraud as similar acts. There was no error in admitting evidence of either fraud.

## IV. Insufficiency of the Evidence:

■ Birrell contends that an inconsistency in the testimony of Jesse Livermore and Re created a reasonable doubt of guilt as a matter of law, and thus dictated acquittal. Livermore testified that he delivered the 20,000 shares of old Begley stock, given originally to Schneider and Durham, on September 9, 1966. These shares were returned to Birrell because Re had been insisting that Birrell return them to him. According to a memorandum of Re, however, as of September 6, 1966, only 10,-050 shares were missing. Hence an inconsistency does arise, though in reference only to the similar acts of fraud, and not to the fraud under count two, the subject of the trial.

However, the inconsistency was minor, and the jury could have believed that Livermore was mistaken about the date of redelivery to Birrell, and that Re's memorandum had recorded the proper date. Defense counsel strenuously argued the inconsistency to the jury, and the jury apparently concluded that all that was involved was faulty memory on a comparatively insignificant point. This was a legitimate question for the jury, and we cannot say that the inconsistency created a reasonable doubt as to defendant's guilt as a matter of law.

## V. Coercion of the Supplemental Charge:

■ The argument is made that the trial judge's supplemental charge to the jury after the jury had indicated it was deadlocked unduly coerced the jury into reaching a verdict of guilty. The vote at that time was four votes for guilty, eight for not guilty. In his supplemental charge to the jury, the trial court stated: "I am frank to say that I see no reason why a verdict cannot be reached." Two and one-half hours later, the jury returned a guilty verdict.

This type of charge, called an *"Allen"* charge [see Allen v. United States, 164 U.S. 492, 17 S.Ct. 154, 41 L.Ed. 528 (1896)], has consistently been upheld by this court. See, e. g., United States v. Bowles, 428 F.2d 592, 595 (2d Cir. 1970); United States v. Barash, 412 F.2d 26, 32 (2d Cir.), cert. denied, 396 U.S. 832, 90 S.Ct. 86, 24 L.Ed.2d 82 (1969). In any case, it appears that if any coercive effect would have resulted from the trial judge's *Allen* charge, it would have been aimed towards those who had been voting for a guilty verdict, since at the time the vote was strongly in favor of acquittal.

## VI. Hearing on Indictment:

■ Birrell claims that in this case he is entitled to a hearing to determine whether the specific terms of his indictment were considered by the grand jury. Birrell argues that a hearing is called for, since the government has refused to deny categorically the assertion that the grand jury did not actually pass on the terms of the indictment, since there were amendments made to the bill of particulars by the government, and since there existed what Birrell calls "striking inconsistencies" between the testimony elicited at trial and before the grand jury on the one hand and the terms of the indictment on the other. Birrell's claims, however, are purely speculative. At no time has he demonstrated any possibly concrete factual support for his charge that the grand jury failed to consider the specific terms of the indictment that he might develop at a hearing. There was no need to hold a hearing on this issue.

The judgment of conviction is affirmed.