**UNITED STATES of America,
Appellee,**

v.

**Lewis L. COLASURDO et al., Appellants.**

**Nos. 1085–1088, Dockets 71–1373
to 71–1376.**

United States Court of Appeals,
Second Circuit.

Argued July 13, 1971.

Decided Dec. 6, 1971.

Lumbard, Circuit Judge, filed concurring opinion.

Paul R. Connolly, Washington, D.C., Morrison, Paul & Beiley, New York City (Edward Bennett Williams, Washington, D.C., Peter H. Morrison, New York City, John Vardaman, Jr., Washington, D.C., Myron J. Greene and Elkan Abramowitz, New York City, of counsel), for appellant Colasurdo.

Charles A. Stillman, Botein, Hays, Sklar & Herzberg, New York City for appellants McLaney, Cipo and Whorl.

H. Thomas Coghill, Asst. U. S. Atty. (Whitney North Seymour, Jr., U. S. Atty. for the Southern District of New York, and Jack Kaplan, John A. Lowe, Barbara A. Rowan, James P. Tierney, and Peter F. Rient, Asst. U. S. Attys., of counsel), for appellee.

Before FRIENDLY, Chief Judge, and LUMBARD and OAKES, Circuit Judges.

OAKES, Circuit Judge:

This very complex, exceptionally well presented appeal raises a series of questions—going both to the conspiracy and the substantive counts—that requires, as did United States v. Wolfson, 437 F.2d 862 (2d Cir. 1970), a rather extensive recital of the facts. This recital is especially necessary to understand the *Wolfson* and *Grunewald* [1] points made by appellants in this SEC case, which took 12 weeks to try, with over 50 witnesses and 700 documentary exhibits, a correspondingly extensive record, and briefs, on appeal.

In essence, the case involves Lewis Colasurdo and certain of his associates who used an asset of Pakco Companies, Inc. ("Pakco"), an over-the-counter company, to purchase two blocks of stock—a controlling interest—of Crescent Corporation ("Crescent"), a company listed on the New York Stock Exchange. The resultant criminal charges involve con-

1. Grunewald v. United States, 353 U.S. 391, 77 S.Ct. 963, 1 L.Ed.2d 931 (1957).

cealment from the Securities and Exchange Commission of that purchase, the concealment being effectuated by a series of sham transactions followed by false reports, statements and testimony to and before the SEC, and other attempts to obstruct "private" and "public" SEC investigations.

The Pakco asset used was a 2500 acre blueberry plantation located in Atlantic County, New Jersey. Acquired originally from appellant Colasurdo at the time of Pakco's organization, the plantation was carried on the books of Pakco at one dollar although it was appraised in 1961 at $2.5 million. Appellant Colasurdo, who with his two brothers owned approximately 42 per cent of this publicly held corporation, also was its president until June 1965, when he assumed control of and became president of Crescent. Pakco's and subsequently Crescent's vice president was one Bronsen, a fugitive from justice and not an appellant here. Pakco's controller, and subsequently Crescent's treasurer, was appellant Whorl. Appellants Cipo and McLaney were neither officers nor directors of Pakco or Crescent but were participants in some of the transactions by which the Pakco plantation ultimately became an asset of Crescent's and by means of which a controlling interest in Crescent was acquired by appellant Colasurdo.

The control of Crescent was obtained by the purchase of two large blocks of Crescent stock. The first was the Floersheimer block, consisting of 436,400 shares, which was sold to ALCA Industries, Inc. ("ALCA"), a corporation solely owned by Colasurdo and formed for that purpose. The second was the Mencher block, consisting of 125,000 shares, which was sold to BLCB Industries, Inc., a corporation owned by Bronsen and formed for that purpose. ALCA's purchase price for the Floersheimer block was $15 per share or $6,546,000, one-third to be paid at closing, June 18, 1965; one-third in June 1966; and one-third in June 1967. BLCB's purchase price for the Mencher block was also $15 per share or $1,875,000, payable

$1,005,000 on the same closing date, June 18, 1965, and the balance in three equal promissory notes of $290,000 each, payable at six month intervals thereafter. Financing of the ALCA down payment was obtained by ALCA's borrowing $218,200 from Pakco and the balance of $1,963,800 from the First Pennsylvania Bank and Trust Company. The bank's loan was secured by Colasurdo's personal guarantee and by escrow arrangements involving both ALCA stock and the Crescent stock acquired. Financing of the BLCB acquisition was by way of a $100,000 loan to Bronsen by Pakco, a $900,000 loan by the Franklin National Bank to Bronsen guaranteed by Colasurdo and further secured by the Crescent stock acquired, and the guarantee by Colasurdo and his wife of the three notes of BLCB due for the purchase price.

The Pakco asset, the blueberry patch, then became the center of the following transactions. Its sale to one Charles E. Meyers, or his nominee, for $3,850,000 was authorized by the Pakco board on May 19, 1965, with $500,000 to be paid for the blueberry crop in cash by December 1, 1965, and a five year installment note ($670,000 each installment) being taken for the $3,350,000 balance on the land. The sale was to be *without security* to Pakco except for a guarantee on the note by appellant McLaney. On May 31, 1965, the sales agreement was entered into and Meyers assigned his right to purchase to appellant McLaney. McLaney took title in the name of Caletta Blueberry Co., Inc. ("Caletta")—a corporation formed August 6, 1965, for the purpose of the acquisition—on August 9, 1965, by deed recorded on September 23, 1965. Appellant Whorl (who it will be remembered was Pakco's controller) was secretary-treasurer of Caletta.

But Caletta was not to hold title to the popular, if ubiquitous, blueberry plantation for long. Rather, by agreement dated August 31, 1965, it was sold to Makepeace, Inc. The sales price was $3.9 million, with $500,000 to be paid one day before the first Meyers payment of the same amount to Pakco' was due,

and the balance in five equal installments of $680,000 payable three months before and in a sum $10,000 greater than the McLaney guaranteed note to Pakco. The deed *from* Caletta was recorded on the same day, September 23, 1965, as the deed *to* Caletta. Makepeace, Inc., it may be noted, was wholly owned by appellant Cipo, a former employee of a Pakco subsidiary. The same attorney, Israel Finkelstein, who was a Philadelphia collection attorney for Pakco, formed Caletta *and* formed Makepeace, Inc., reserving the latter's corporate name on June 8, 1965, and incorporating it on July 21, 1965, before Caletta's date of corporate birth. Colasurdo, who was by June 29, 1965, president and firmly installed in control of Crescent (constituting with Bronsen, appellant Whorl and another nominee four of Crescent's seven directors), commenced "negotiating" with Makepeace for the sale of the blueberry plantation to Crescent. The "negotiation" was quickly consummated; Crescent agreed, on September 15, 1965, to pay Makepeace $4 million, consisting of $600,000 in cash, 125,000 shares of Crescent stock valued at $1.5 million, and an installment promissory note for $1.9 million with a right of prepayment by Crescent. Attorney Finkelstein represented Makepeace at the closing, which took place (subject to escrow for title clearance) on September 25, 1965—two days after the recording date for the deeds to Caletta and Makepeace. Crescent then prepaid the $1.9 million note. Makepeace in turn paid $500,000 to Caletta which paid it to Pakco. The balance of $2 million which Makepeace now had as cash was transferred to an account of Delaware & New Jersey Properties, Inc. ("Delaware & New Jersey"), a corporation formed by Bronsen, which transferred the funds to ALCA (Colasurdo's Crescent stock acquisition company) which paid its indebtedness to First Pennsylvania.

The Makepeace-to-Delaware & New Jersey-to-ALCA transaction was explained by appellant Colasurdo as the proceeds of a loan to him from Six M's Ltd., a Bahamian corporation headed by the lawyer-Premier Lyndon O. Pindling, who —because he is said to have said he did not want to take $2 million out of the United States (having just sold a $2 million debenture of Makepeace to Cipo) and bring it back again—was willing to take an assignment of Bronsen's interest in Delaware & New Jersey so as to facilitate the loan to Colasurdo.

Ultimately, in March and April of 1967, Pakco acquired the ALCA and BLCB Crescent stock from those corporations and the 125,000 shares of Crescent held by Caletta (thereby reducing Caletta's obligation to Pakco) and thereby had a controlling interest in Crescent. This Pakco subsequently sold for a profit of over $1.6 million.

In sum, by concealing the fact that Pakco was actually selling the blueberry plantation to Crescent, Colasurdo was able to gain control of Crescent by the use of Crescent's own money. Moreover, because Crescent made immediate payment of its obligation to Makepeace, Colasurdo was able to use the $2 million received from Crescent to repay ALCA's loan from First Pennsylvania. Meanwhile it would be five years before Caletta would have to repay Pakco. Additionally, because each dummy corporation made a profit on each of the "sales," McLaney and Cipo each realized a substantial sum from their participation in the scheme.

Commencing in July 1965, Crescent filed with the SEC and New York Stock Exchange its Form 8–k and 10–k reports. The 8–k Report for June 1965, prepared and signed by appellant Whorl, stated:

> On June 18, 1965, Alca Industries Corporation acquired in a private transaction 436,400 shares of the registrants [sic] common stock constituting 28% of the outstanding shares in this class and 25% of all outstanding voting stock.

This report did not refer to Colasurdo's ownership of ALCA or to BLCB's purchase. (It was the subject of Count 22, charging false and misleading statements

to the SEC, on which Colasurdo and Whorl were found guilty.)

Crescent's Form 8–k Report for September 1965, likewise prepared and signed by Whorl, stated

125,000 shares of treasury stock valued at $12.00 per share were issued in exchange for land, buildings, machinery and equipment,

but did not mention (1) that the lands, *et cetera*, were the Pakco blueberry plantation, (2) Colasurdo's control of Pakco or (3) the paying of $1.9 million in a note and $600,000 in cash to Makepeace. (The report was the subject of Count 23 of the indictment, of which Colasurdo and Whorl were also found guilty.)

The form 10–k financial part of Crescent's 1965 annual report stated

Subsequent to June 30, 1965, the company acquired the net assets of a land development and agriculture company for $600,000 cash, $1,900,000 $5\frac{1}{2}\%$ notes paid prior to December 31, 1965, and 125,000 shares of common stock,

but did not disclose that the assets were purchased from Pakco, Crescent's affiliate, or Colasurdo's interest in the transaction. (It was the subject of Count 26 of the indictment on which Colasurdo was found guilty and Whorl not guilty.)

The accompanying narrative report, filed with the SEC on Form 8, similarly failed to disclose the plantation purchase was with an affiliate and that Colasurdo had an interest in it. (It was the subject of Count 27 of the indictment on which Colasurdo was found guilty and Whorl not guilty.)

Following an SEC investigation, which included a private proceeding where testimony was given by appellants Colasurdo, Cipo, Whorl and McLaney, the Government sought and obtained a 45-count indictment against appellants, as well as

against Bronsen, Finkelstein and five others. Bronsen was, as we have said, a fugitive at time of trial and Attorney Finkelstein was dead. Count One charged all defendants with conspiracy to defraud the SEC and to commit certain offenses against the United States and all appellants were convicted on it; it is the main object of this appeal. Counts 2 through 19, charging wire and mail fraud, were severed, and Counts 20 and 21 were dismissed, on the court's own motion, as were Counts 24 and 28. Counts 22, 23, 26 and 27 were the false filing counts above referred to, as was Count 25 on which both Colasurdo and Whorl were found not guilty. Counts 29 through 45, charging perjury, false statements before the SEC and obstruction of justice, were severed by the court prior to trial.

Thus, as the case went to the jury, all appellants were charged with conspiracy (Count One),[2] and appellants Colasurdo and Whorl with false filings on five counts (Counts 22, 23, 25, 26 and 27).

With the foregoing barebone skeleton of the facts underlying this appeal, we turn to appellants' first and major contention—that the conspiracy count was improperly amended by the court below in violation of appellants' constitutional rights, so as to require dismissal under *Ex parte Bain*, 121 U.S. 1, 7 S.Ct. 781, 30 L.Ed. 849 (1887), and *Russell v. United States*, 369 U.S. 749, 82 S.Ct. 1038, 8 L.Ed.2d 240 (1962), or, alternatively, that the court erred in omitting to instruct the jury that allegations of fraud on the stockholders and creditors of Pakco and Crescent were being removed from the case, so as to require a new trial under *United States v. Wolfson, supra*.

Count One, to detail it more, charged appellants (and others) with conspiracy

---

2. Three individual defendants including one of Colasurdo's brothers were acquitted on Count One, and the court dismissed as to appellant Cipo on two of the false filing counts, 26 and 27. Each defendant was fined $10,000 on each count on which he was convicted. Cola-

surdo was sentenced to two years' imprisonment on Count One and one year on Count 26, the terms to be concurrent. Whorl and McLaney were each sentenced to one year's imprisonment on Count One but McLaney's sentence was suspended.

to defraud the United States and the SEC and to commit against the United States violations of 15 U.S.C. § 78m (prohibiting, *inter alia*, acquisitions of issuers' securities without disclosure of "the background and identity" of persons on whose behalf acquisition has been made); 15 U.S.C. § 78ff(a) (penalizing false or misleading filings); and 18 U.S.C. §§ 1001 (fraud on United States agency), 1341 (mail fraud), 1343 (wire fraud), 1505 (obstruction of justice), 1621 and 1622 (perjury). Nine parts of the conspiracy were alleged: (1) submitting to the SEC false offers of settlement, a part struck by agreement of counsel; (2) making false statements in an SEC matter; (3) making false statements in reports filed with the New York Stock Exchange and the SEC; (4) failing to file reports required by 15 U.S.C. § 78m; (5) and (6), defrauding the stockholders and creditors of Pakco and Crescent and using the mails (5) and wire (6) to execute the fraud; (7) obstructing justice in SEC proceedings; (8) committing perjury before the SEC; and (9) suborning perjury.

■ The trial court was concerned with the "Grunewald problem." *Grunewald*, note 1 *supra*. In that case the Supreme Court held that absent direct evidence of agreement, acts of concealment in and of themselves are insufficient to sustain a conviction for conspiracy to conceal. Judge Bonsal struck that portion of the conspiracy count [parts (5) and (6)] relating to fraud on the stockholders and creditors of Crescent and Pakco, but denied a motion to dismiss the entire conspiracy count. We do not think this was prejudicial, since the elimination of the supporting allegations of the fraud on creditors and stockholders narrowed, rather than broadened, the reach of the conspiracy count. Salinger v. United States, 272 U.S. 542, 548–549, 47 S.Ct. 173, 71 L.Ed. 398 (1926); New England Enterprises, Inc. v. United States, 400 F.2d 58, 62 (1st Cir. 1968), cert. denied, 393 U.S. 1036, 89 S.Ct. 654, 21 L.Ed.2d 581 (1969); Overstreet v. United States, 321 F.2d 459, 461 (5th

Cir. 1963), cert. denied, 376 U.S. 919, 84 S.Ct. 675, 11 L.Ed.2d 614 (1964).

In Ex parte Bain, 121 U.S. 1, 7 S.Ct. 781, 30 L.Ed. 849 (1887), there was an actual physical amendment of the indictment. There the indictment contained a single count, for bank fraud, in which an integral facet was the statement that the defendants had acted with intent to deceive the Comptroller of the Currency. Without resubmission to a grand jury, the trial court struck the reference to the Comptroller as surplusage; but in the context of the particular indictment the Court concluded that it was "not impossible nor very improbable that the grand jury looked mainly to [the Comptroller] as the party whom the prisoner intended to deceive. . . ." 121 U.S. at 10, 7 S.Ct. at 786. In short, the Court found that the trial court's action had worked a fundamental change in the charge set forth in the indictment. Here, however, as in *Salinger, supra,* whether the trial court was right or wrong in narrowing the charge—as to which we also intimate no opinion—the trial was on the main charge preferred (here a scheme to commit fraud on the SEC) and the portion of the manifold scheme ordered stricken was unnecessary to the commission of the basic fraud charged. *See also* Thomas v. United States, 398 F.2d 531, 537 n. 10 (5th Cir. 1967); Overstreet v. United States, *supra.* The reason for the withdrawal of a part of a charge is to us immaterial. *Cf.* United States v. Wolfson, *supra,* 437 F.2d at 873 (reason, legal insufficiency); Overstreet v. United States *supra* (reason, crimes, the perpetration of which was charged as objective of conspiracy, carried different sentences).

Russell v. United States, 369 U.S. 749, 82 S.Ct. 1038, 8 L.Ed.2d 240 (1962), relied upon by appellants, is not to the contrary; there, an indictment charging perjury in several particulars was held insufficient to apprise the defendant of the charges against him because it failed to allege what was the subject of inquiry, vitally necessary to the issue of materiality. The Court there recognized that

amendments of "form" as opposed to substance are permissible, stating that ". . . an indictment may not be amended except by resubmission to the grand jury, unless the change is merely a matter of form." 369 U.S. at 770, 82 C.Ct. at 1050. Stirone v. United States, 361 U.S. 212, 80 S.Ct. 270, 4 L.Ed.2d 252 (1960), is also inapposite since there the indictment alleged interference by extortion with the *importation* into Pennsylvania of sand to be used in building a new plant, but the trial court permitted the case to go to the jury on evidence concerning interference with the *exportation* from Pennsylvania of steel to be manufactured in the new plant. That is, the specific charges in the indictment were enlarged by the trial court in a material way.

■ The other string to appellants' bow is the claim that even if the trial court properly removed the allegations of stockholder and creditor fraud from the jury's consideration, it should have given appellants a new trial, because evidence pertaining to fraud on the stockholders and creditors had been admitted. In support of this point, appellants argue at length and in depth the similarities of this case and United States v. Wolfson, *supra.* But in *Wolfson* the alleged fraud

on stockholders was the first item of the conspiracy allegations; the first seven means by which the conspiracy was carried out stressed such fraud, as did the Government's opening statement; and the court did not advise the jury immediately of the limitations on the charges after striking the stockholders fraud allegations. Here, however, the evidence relating to the blueberry plantation transfers was background only.[3] The indictment was not read to the jury. The Government's opening made so little of the fraud on stockholders that the defendants themselves moved to dismiss that part of the indictment on the basis of the opening. When the trial court limited the indictment at the close of the Government's case, it promptly instructed the jury that it would not have to consider the counts of mail fraud,[4] and spelled out that the conspiracy charge was one to defraud the United States and the SEC by concealment, filing false statements, committing and suborning perjury, and so forth.[5]

■ Appellants further contend that there was insufficient evidence to support a conviction under the conspiracy count in that there was no direct evidence of an agreement to conspire to defraud the SEC. They rely upon Grune-

---

3. As such it was properly admitted and the motion to strike it was properly denied. United States v. Abrams, 357 F.2d 539, 546 (2d Cir.), cert. denied, 384 U.S. 1001, 86 S.Ct. 1922, 16 L.Ed.2d 1014 (1966) ; United States v. Guterma, 281 F.2d 742, 746 (2d Cir.), cert. denied, 364 U.S. 871, 81 S.Ct. 114, 5 L.Ed.2d 93 (1960).

4. Appellants claim the court was referring solely to the mail fraud counts (2–21). But since as a part of the conspiracy fraud on stockholders and creditors was alleged to be by mail and wire, the reference to mail fraud could properly be read to refer to the conspiracy count. And only confusion would have ensued since the court was not striking the evidence of the blueberry plantation transfers and Crescent stock purchase manipulations. That evidence was properly admissible on the basic conspiracy charge— to defraud the United States and SEC by concealing the transactions.

5. "The indictment charges a conspiracy ; it charges the defendants with conspiring together to defraud the United States and the Securities and Exchange Commission by concealing material facts concerning the transactions between Pakco and Crescent involving, you remember, the Caletta Blueberry, Makepeace, and these other people about whom we have heard testimony here during this long trial.

"The indictment charges—and again I repeat it, it is only a charge—the conspiracy was carried out by the filing of false statements with the Securities and Exchange Commission, by the commission of perjury before the Securities and Exchange Commission and by urging others to commit perjury, and by endeavoring to obstruct justice, that means endeavoring to obstruct the Securities and Exchange Commission in the performance of the Commission's duties."

wald v. United States, *supra*; Krulewitch v. United States, 336 U.S. 440, 69 S.Ct. 716, 93 L.Ed. 790 (1949), and United States v. Bufalino, 285 F.2d 408 (2d Cir. 1960). These cases stand for the proposition that "[a]cts of covering up, even though done in the context of a mutually understood need for secrecy, cannot themselves constitute proof that concealment of the crime after its commission was part of the initial agreement among the conspirators." *Grunewald, supra*, 353 U.S. at 402, 77 S.Ct. at 972. But here of course the concealment was the essence of the object of the conspiracy—concealment from the SEC of the use of a Pakco asset to accomplish the Crescent takeover was the very aim of the sham transactions in which the conspirators engaged. Filing false statements with, and submitting false testimony to, the SEC were means of furthering that aim, since both Pakco and Crescent were publicly owned and required to disclose to the SEC transactions such as were engaged in here.

Colasurdo and Whorl were involved from the beginning. They engineered the plantation transactions so as to avoid making it appear to the SEC that Crescent's money to purchase the blueberry plantation was really being used by Colasurdo to buy Crescent stock. Caletta and Makepeace were simple conduits, shams to make is appear that the sales were at arm's length. McLaney and Cipo were front men for the conduit corporations; they each incidentally made a tidy sum without putting up any money or using their own credit. Cipo falsely told Mr. Balterman, Crescent's SEC attorney, that he, Cipo, was in no way affiliated with Colasurdo at the Crescent-Makepeace closing on September 25, 1965. McLaney's corporation, Caletta, had a corporate address that was a Philadelphia auto showroom operated by a client of the Pakco-Caletta-Makepeace lawyer, Finkelstein. Cipo falsely testified in the first SEC investigation that he had no connection with Colasurdo except through the sale of the plantation to Crescent and that he used the $1.9 million prepayment of Crescent in his other businesses. He subsequently swore that Makepeace was going to invest the $1.9 million in a convertible debenture of Six M's Ltd., the Bahamian corporation, and that when he heard of Colasurdo's desire to borrow $2 million from Six M's, he put Colasurdo in touch with Pindling, the president of Six M's.

But there was evidence that on October 5, 1965, when appellant Colasurdo swore (in an affidavit filed with the SEC on August 22, 1966), that he through Cipo borrowed $2 million from Six M's, Six M's was merely a corporate shell; its articles of association were dated September 28, 1965, and filed in Nassau on October 1, 1965. There was evidence, moreover, that the papers purporting to constitute an assignment by Bronsen of the Delaware & New Jersey Properties, Inc., to Six M's, as well as the debenture transaction with Makepeace and the loan to Colasurdo, had been fabricated and backdated. Six M's was struck by the Registrar General of the Bahamas as a defunct corporation on April 3, 1967. Cipo as the Makepeace front and the introducer of Colasurdo to Six M's was an active participant in the overall deceit; it was vital to keep Crescent's SEC attorney, Balterman, from knowing what was going on and Cipo, it will be remembered, was the one who told Balterman that he was in no way affiliated with Colasurdo. The instruments effectuating the transfer of the plantation to Crescent were signed by Cipo for Makepeace and by Bronsen for Crescent. McLaney, as the front for Caletta, was aware of the sham in which he was engaged. He participated in the plantation transfers which were to conceal the basic transaction from the SEC. He signed a guarantee of all Meyers' liability in connection with the sale of the plantation by Pakco to Meyers, which was a keystone of the basic transaction, since the absence of a Pakco mortgage on the plantation was ultimately what enabled Colasurdo to use Crescent money to finance the purchase of Crescent stock.

In other words, there was direct evidence of acts of concealment of a continuing conspiracy in which concealment was not only essential to the success of the scheme but was the very heart and object of it. Forman v. United States, 361 U.S. 416, 421–422 n. 5, 80 S.Ct. 481, 4 L.Ed.2d 412 (1960). We read *Grunewald, supra,* Lutwak v. United States, 344 U.S. 604, 73 S.Ct. 481, 97 L.Ed. 593 (1953), and *Krulewitch, supra,* as did the Supreme Court in Ingram v. United States, 360 U.S. 672, 679 n. 10, 79 S.Ct. 1314, 1319, 3 L.Ed.2d 1503 (1959):

> The Court's decisions in Grunewald v. United States, Lutwak v. United States, and Krulewitch v. United States, do not, as petitioners appear to contend, prevent the jury from treating this subsidiary objective [secrecy] as an element of the conspiracy. Those cases hold only that the life of the conspiracy cannot be extended by evidence of concealment after the conspiracy's criminal objectives have been fully accomplished. (Citations omitted.)

Here, unlike United States v. Bufalino, 285 F.2d 408 (2d Cir. 1960), the statements and acts of the appellants were similar in that they each attempted to convey to the SEC that Pakco-Crescent acquisition transactions were in each instance at arm's length and good faith business dealings, not shams to keep the SEC from discovery of the true acquirer, the true means of acquisition and the true facts surrounding the acquisition. In the Form 8–k and 10–k Crescent reports, Colasurdo and Whorl disclosed enough to mislead the SEC with half-truths and concealed the key facts underlying the transactions (Colasurdo's ownership of ALCA, BLCB's purchase, involvement of the Pakco blueberry plantation, the purchase of the blueberry plantation from Pakco and Colasurdo's interest in the transaction).

Furthermore, there was evidence that Colasurdo said to Balterman during the public SEC proceedings when Balterman was about to cross-examine Whorl (to establish that Whorl had not consulted with counsel prior to filing these reports) "If you open your—if you examine him, you won't live long enough to see your wife and children again." Earlier Whorl had asked Balterman to destroy documents linking Makepeace and Finkelstein and not to mention Finkelstein, whose participation as attorney for Caletta and Makepeace was known to Cipo and McLaney also. (Cipo did not mention Finkelstein when he testified in the SEC "private" proceedings on who was present at the Makepeace-Crescent closing.) The charge was correct and appropriate:

> In determining whether the conspiracy charged existed, you should consider the evidence with respect to the acts, declarations and conduct of the alleged conspirators as a whole and the reasonable inferences you find may be drawn from the evidence.

> Mere similarity of conduct among the alleged coconspirators, or the fact that they may have associated with each other, or that two or more of them may have discussed together common aims and interests, does not by itself establish that there was a conspiracy.

■ There was sufficient evidence to warrant conviction of Colasurdo and Whorl on the substantive counts relating to Crescent's filing of false Form 8–k and 10–k reports. The falsity lies in the non-disclosure of pertinent facts called for by the report. *Cf.* United States v. Rao, 394 F.2d 354, 356–357 (2d Cir.), cert. denied, 393 U.S. 845, 89 S.Ct. 129, 21 L.Ed.2d 116 (1968). The first item of information to be included in a Form 8–k report is a change in control of a registrant, and the June 1965 form filed here indicated only acquisition by ALCA, not BLCB or the true "parent," Colasurdo.[6] Crescent's Form 8–k for September 1965 omitted to state the true

---

6. The regulations pursuant to the Securities Exchange Act define "parent" as anyone controlling a corporation "directly, or indirectly through one or more intermediaries." 17 C.F.R. § 240.12b–2(k) (1971).

consideration for the purchase of the blueberry patch even though the form required "a brief description of the transaction or transactions resulting in the increase" of the amount of a registrant's securities. It will be recalled that this report referred to the issuance of 125,000 shares of Crescent treasury stock, but failed to mention the payment of $600,000 in cash and a $1.9 million promissory note—items the mention of which would seem to be a part of any description of the transaction, however brief. The omission significantly furthered the concealment of the use of Crescent's money to buy its own stock.

■ The two substantive counts—Counts 26 and 27—on which Colasurdo alone was convicted likewise stand supported by the evidence. The Form 10–k and narrative statement filing for 1965 does disclose the total purchase price paid by Crescent for the plantation but omits to disclose Pakco's or Colasurdo's relationship to the seller. One purpose of a Form 10–k is, after all, to acquaint the SEC with "any material interest, direct or indirect" of any officer or director in a transaction to which the corporation is a party. The instructions so state. The Crescent accountants, after checking title to the blueberry plantation, wanted to include an explanatory footnote which would have disclosed the affiliation. They were dissuaded from doing so by a Colasurdo letter to them in March 1966, which stated that "no benefits inured to me from payment by Crescent Corporation to Makepeace . . . ," and by a letter from Attorney Finkelstein to the effect that there was no affiliation between Pakco and Caletta. Appellant Colasurdo argues that there is a split of opinion among accountants as to whether generally accepted accounting principles require disclosure of transactions among affiliates. But the question is ultimately one of honesty and good faith. United States v. Simon, 425 F.2d 796, 805–806 (2d Cir. 1969), cert. denied, 397 U.S. 1006, 90 S.Ct. 1235, 25 L.Ed.2d 420 (1970). And while reliance upon accountants' advice might be "highly persuasive," although not conclusive, United States v. Simon, *supra*, 425 F.2d at 806, misleading accountants so as to cause them to omit material they would otherwise include is a strong indication of the falsity and misleading nature of the filing actually made. Since the conviction on this count was for making a materially "false or misleading" statement, rather than for violating a rule or regulation, although both are offenses under 15 U.S.C. § 78ff(a), Colasurdo is not entitled to rely on the "no knowledge" portion of the statute.[7] Even if he were, however, evidence shows that Colasurdo had a considerable working knowledge of SEC requirements, as indicated by his argument over the proposed footnote to Form 10–k.

The appellants jointly or severally make certain other points which we will deal with briefly: (1) it was error to permit a Government witness, one Soupart, to testify about transactions with Whorl since he was unable in any way to identify Whorl from photographs or at the trial; (2) the Government's reference in argument to McLaney's use of certain notes in the SEC proceedings was improper; (3) the trial court failed to charge the jury on aiding and abet-

7. Any person who willfully violates any provision of this chapter, or any rule or regulation thereunder the violation of which is made unlawful or the observance of which is required under the terms of this chapter, or any person who willfully and knowingly makes, or causes to be made, any statement in any application, report, or document required to be filed under this chapter or any rule or regulation thereunder or any undertaking contained in a registration statement as provided in subsection (d) of sec-

tion 78*o* of this title, which statement was false or misleading with respect to any material fact, shall upon conviction be fined not more than $10,000, or imprisoned not more than two years, or both, except that when such person is an exchange, a fine not exceeding $500,000 may be imposed; but no person shall be subject to imprisonment under this section *for the violation of any rule or regulation* if he proves that he had no knowledge of such rule or regulation. 15 U.S.C. § 78ff(a) (emphasis supplied).

ting; (4) it was error to fail to hold a hearing on whether the Government procured evidence on which the indictment was based in violation of appellants' attorney-client privilege; (5) the court erred in denying appellants an inspection of the grand jury attendance record; (6) scientific evidence to establish the backdating of documents was improperly admitted; and (7) Cipo was prejudiced by testimony before the SEC and at trial given after April 17, 1967, when he invoked the Fifth Amendment and refused to testify.

■ Soupart testified that one "Bud Whorl" came to his Nassau office in 1966 wanting to buy a corporation, that he took this individual to a lawyer's office where he paid $700 for Six M's Ltd., and that subsequently the individual outlined to Pindling in Soupart's presence a series of transactions involving Six M's, two American corporations, loans of millions of dollars, and the names "Delaware" and "New Jersey." Soupart could not identify Whorl in court, but this goes only to the weight of the testimony since the jury could find from other circumstances that it was in fact a representative of Colasurdo who purchased Six M's and who was acquainted with some of the scheme, and who was either Whorl himself or someone authorized by Colasurdo or Whorl to use Whorl's name. *Cf.* Carbo v. United States, 314 F.2d 718, 743 (9th Cir. 1963), cert. denied *sub nom.* Palermo v. United States, 377 U.S. 953, 84 S. Ct. 1625, 12 L.Ed.2d 498 (1964) (anonymous warning telephone call made at direction of one of conspirators in furtherance of the conspiracy).

■ Appellant McLaney had some notes with questions and answers on them which he used during the public SEC proceedings. At first he told the Hearing Examiner he had written them to himself and later he said the preparer was "a little attorney that works with me." The Government's closing argument that the jury could infer that the notes contained anticipated questions and answers and had been prepared for consistency's sake was, we hold, not improper as an argument of inference which might be drawn in view of all the evidence. United States v. Dibrizzi, 393 F.2d 642, 646 (2d Cir. 1968); United States v. DeFillo, 257 F.2d 835, 840 (2d Cir. 1958), cert. denied, 359 U.S. 915, 79 S.Ct. 591, 3 L.Ed.2d 577 (1959).

■ Colasurdo argues that he could only have been held on the substantive counts as an aider and abetter, under appropriate instructions by the court to the jury. *See* United States v. Byrd, 352 F. 2d 570, 575–576 (2d Cir. 1965); United States v. Garguilo, 310 F.2d 249, 254 (2d Cir. 1962). A request for such an instruction was made by the Government and not the appellant, but was declined by the court, which accordingly informed counsel for appellant before the jury was charged.[8] Appellant at that time made no objection to the omission of an aiding and abetting charge. There is no plain error under Fed.R.Crim.P. 52(b). Unlike *Byrd* and *Garguilo, supra,* the statute here itself used the words "causes to be made." 15 U.S.C. § 78ff(a). There was ample evidence that Colasurdo caused the false reports to be made; indeed, the Form 10–k was false because a footnote was omitted—a footnote which would have been inserted if Colasurdo had not misrepresented the facts to Crescent's accountants.

■ Appellants seek a dismissal of the indictment for failure of the trial

---

8. The charge, more favorable to the appellant perhaps than an aiding and abetting charge, said:

 The government does not contend that each of the alleged false and misleading statements were actually made by Colasurdo and Whorl. Rather the government contends that in each case the false and misleading statements of material facts were either made or caused to be made by the defendants Lewis Colasurdo and Whorl.

 It is sufficient if the government has proved to you beyond a reasonable doubt that the defendant you are considering either made the false and misleading statement or caused the false and misleading statement to be made in the required reports.

court to hold a preliminary hearing on whether the grand jury had before it evidence obtained in violation of the attorney-client privilege. Attorneys who represented either Pakco, Crescent, or the individuals involved during the SEC proceedings were interviewed by the United States Attorney's office; and Jackson (attorney for Pakco), Kenney (attorney for Colasurdo, Whorl and others) and Balterman (attorney for Crescent) testified before the grand jury. In a hearing out of the presence of the jury at trial, the trial court sustained the claim of attorney-client privilege as to Attorney Jackson and Attorney Bondy (a Crescent lawyer). Colasurdo waived the attorney-client privilege as to Attorney Balterman on behalf of himself and Crescent in the SEC proceedings, but reasserted it at trial when evidence of certain conversations dealing with corporation affiliations was sought to be adduced. Even if correct, appellants' assertions would not be grounds for dismissing the indictment. United States v. Blue, 384 U.S. 251, 255, 86 S.Ct. 1416, 16 L.Ed.2d 510 (1966); Lawn v. United States, 355 U.S. 339, 348–350, 78 S.Ct. 311, 2 L.Ed.2d 321 (1958); Costello v. United States, 350 U.S. 359, 363, 76 S.Ct. 406, 100 L.Ed. 397 (1956) (indictment based on hearsay). Otherwise, before trial on the merits there would always be a kind of preliminary trial to determine the competency and adequacy of the evidence before the grand jury, with resultant delay. See Lawn v. United States, supra, 355 U.S. at 349, 78 S.Ct. 311.

Both Balterman and Kenney testified at trial, the former after an express and unconditional waiver of the privilege, and their grand jury testimony was furnished to the defense as Jencks Act material. Nevertheless, no instance in which either's grand jury testimony is said to have violated the attorney-client privilege is referred to by appellants; the only argument is that the SEC in pretrial interviews "may have impinged upon attorney-client relationships." Attorney Bondy, a Crescent attorney, was also interviewed by the United States

Attorney's office but he did not testify before the grand jury and at trial the privilege was allowed as to his testimony. Attorney Jackson did not testify at trial. In re Terkeltoub, 256 F.Supp. 683 (S.D. N.Y.1966), relied on by appellants, is not material to this case since there the attorney was sought to be examined after indictment of his client, and his investigation and preparation were the objects of the inquiry.

Appellants argue that they should have been permitted to inspect the grand jury attendance records to determine whether "12 or more jurors" under Fed.R.Crim.P. 6(f) were sufficiently in attendance when evidence to support each of the "233 decisions," involving 11 defendants and 45 counts, was made by the grand jury. The rather ingenious suggestion by counsel that would require a preliminary trial to determine not just the sufficiency of the evidence on each count to sustain the individual count, but a determination of each juror's presence at the time when each item of evidence was introduced would bog down the courts in a morass, a veritable jungle of speculation and conjecture. Cf. Costello v. United States, 350 U.S. 359, 76 S.Ct. 406, 100 L.Ed. 397 (1956). It is enough to say, as Chief Judge Learned Hand said in United States ex rel. McCann v. Thompson, 144 F.2d 604, 607 (2d Cir.), cert. denied, 323 U.S. 790, 65 S.Ct. 313, 89 L.Ed. 630 (1944):

> Since all the evidence adduced before a grand jury—certainly when the accused does not appear—is aimed at proving guilt, the absence of some jurors during some part of the hearing will ordinarily merely weaken the prosecution's case. If what the absentees actually hear is enough to satisfy them, there would seem to be no reason why they should not vote.

Appellants additionally argue that evidence of the backdating of Government Exhibit 504, McLaney's guaranty of Meyers' obligations to Pakco, to

May 31, 1965, was improperly admitted.[9] This evidence was in the form of expert testimony by an IRS employee, Richard Brunelle, that the ink on the document was made by the Fisher Pen Company, and from a witness from Fisher that the particular ink was not marketed until two months after the date borne by the questioned document. Appellants argue forcefully that the weight of the evidence is that the Government's ink expert was wrong, and that the present state of the art of ink analysis does not justify admission of this testimony. In support of this argument, appellants have pointed out that the Government's expert is the only one in the world who claims to be able to identify inks and that testimony by the very witness here involved was rejected recently in the Eastern District of Pennsylvania.[10] Here his testimony was adduced without objection. Nor can appellants claim surprise, since on November 18, 1970, they indicated that they might question the scientific basis for opinion testimony on ink identification, which appellants had known would be offered at least as early as October 28, 1970.[11] *See* United States v. Indiviglio, 352 F.2d 276 (2d Cir. 1965), cert. denied, 383 U.S. 907, 86 S.Ct. 887, 15 L.Ed.2d 663 (1966). Appellants elected to battle it out with their own expert evidence to the contrary. Absent a timely objection to the competency of the Government's witness, the weight of the experts' testimony was for the jury. United States v. Stifel, 433 F.2d 431 (6th Cir. 1970), cert. denied, 401 U.S. 994, 91 S.Ct. 1232, 28 L.Ed.2d 531 (1971); United States v. Kelly, 420 F.2d 26, 28 (2d Cir. 1969).

 The last point raised, on appellant Cipo's behalf, is that he withdrew from the conspiracy on April 17, 1967, when he invoked his Fifth Amendment privilege and refused to testify before the SEC. Thus, the argument runs, any testimony before the SEC thereafter and at trial relating to any time after April 17, 1967, was erroneously admitted. Suffice it to say we agree with the trial court's conclusion that assertion of the privilege "is a neutral act from which no inferences can be drawn." It is not the "affirmative action" required by Hyde v. United States, 225 U.S. 347, 369, 32 S.Ct. 793, 56 L.Ed. 1114 (1912); *see also* United States v. Borelli, 336 F.2d 376, 388 (2d Cir. 1964), cert. denied *sub nom.* Cinquegrano v. United States, 379 U.S. 960, 85 S.Ct. 647, 13 L.Ed.2d 555 (1965). While assertion of the privilege may not, of course, be considered to have furthered the concealment, it was not inconsistent with continuation of the concealment and certainly did not constitute withdrawal from the conspiracy. United States v. Borelli, *supra,* 336 F.2d at 389. No request to leave the issue of withdrawal to the jury was made; it is therefore unnecessary for us to consider the complexities of a charge which would refer to invoking the Fifth Amendment on the one hand and not be prejudicial to the defendant on the other. *Cf.* Bruton v. United States, 391 U.S. 123, 135, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968).

Judgment affirmed.

LUMBARD, Circuit Judge (concurring):

I concur in all of Judge Oakes' excellent opinion. As to the trial judge's striking out paragraphs 6 and 7 of Count I, I think more needs to be said. I can see no good reason for the trial

---

9. All appellants rely on this point, but it is appellant McLaney who is most concerned with it.

10. United States v. Bruno, 333 F.Supp. 570 (E.D.Pa., 1971) (Brunelle's testimony held inadequate to sustain conspiracy count since many foreign inks were not included in his "ink library" and other variables were not taken into account).

11. The Government had given appellants a copy of Brunelle's report on Exhibit 504, the McLaney guarantee, and other documents in April of 1970. Appellants did not know there would be back-dating testimony until November 6, 1970. Their requests for time extensions on November 6 and November 19 to prepare for Brunelle's testimony were granted.

judge striking out, over the government's objection, the portions of the indictment that alleged that Colasurdo had defrauded the stockholders and creditors of Pakco and Crescent through the use of the mails and wires.

The entire scheme was an attempt by Colasurdo to conceal from the stockholders and creditors the sham nature of the sales of the blueberry patch that allowed him, in effect to borrow from Crescent $2,000,000 for five years with which he purchased his controlling interest in Crescent. False reports to the SEC were only a portion of this scheme; for it to succeed, it was equally important that all information received by the stockholders and creditors be tailored so as to keep them ignorant of the real nature of Colasurdo's transactions. Obviously then, the allegations in the indictment that fraudulent material was transmitted to Pakco and Crescent stockholders and creditors over the wires and through the mails were quite properly included in the indictment and the government was entitled to prove these charges to the jury.