**UNITED STATES of America, Plaintiff,**

**v.**

**Alfredo DIAZ; Eradio Perez; and Jose Alfonso Riano, Defendants.**

**No. 87 CR 338.**

United States District Court,
E.D. New York.

Nov. 25, 1987.

---

Andrew J. Maloney, U.S. Atty., E.D. N.Y., Brooklyn, N.Y., (Debra D. Newman, Freeport, N.Y., of counsel), for plaintiff.

Carl L. Masztal, Miami, Fla., for defendant Diaz.

Barry E. Schulman, Brooklyn, N.Y., for defendant Riano.

Hector Rosado, for defendant Perez.

McLAUGHLIN, District Judge.

Defendants are named in a one-count indictment charging them with conspiracy to possess cocaine with intent to distribute it in violation of 21 U.S.C. § 846. They have made several pre-trial motions. A hearing was held and the following embodies rulings delivered from the bench at the conclusion of the hearing.

## I. FINDINGS OF FACT

On April 1, 1987 Agent Michael Torretta of the Drug Enforcement Administration ("DEA") observed two men at a public telephone placing calls using a beeper. On a prior occasion, in February 1987, Agent Torretta had seen beeper calls being placed from that phone by individuals who turned out to be carrying five kilograms of cocaine in plastic bags. He followed the two men he saw on April 1. The two men drove to a house at 46–18 190th Street in Flushing, New York. They entered, and then exited carrying two apparently heavy white plastic shopping bags, which they placed in the trunk. They drove one-half mile to another phone booth, and soon were met by another car. The agent moved his car at this point to get a better view. When he next observed the two men, the second car was driving away. The agent followed the first car, stopped it and asked to look in the trunk. The occupants consented, but the plastic bags were gone.

The DEA commenced periodic surveillances of the house from April through May 7, 1987. On one occasion two Hispanic men were observed leaving the house and going to the same public phone. They noted that basement and bedroom lights had been left on. In addition, investigation disclosed that the electric bill for March 1, 1987 to April 1, 1987 was significantly more than the normal amount for the neighborhood, and mail delivery consisted of electric bills and junk mail. There was no telephone listing for the house. Based on their investigative experience, these oddities led the DEA to believe that the house was not a regular residence, but rather a narcotics stash pad or laboratory.

On May 7, 1987 agents interviewed a neighbor who corroborated this conclusion. The neighbor stated that the house would be empty for a period, followed by a flurry of activity. Men were seen coming and going, but the house did not seem to be used as a residence. The basement and bedroom lights were left on constantly, and mattresses and garbage bags often were transported in and out of the house.

As the agents stood on the neighbor's stoop, the three defendants drove up to the suspected drug house, about 20 to 30 feet away, in a gray Chevrolet Caprice. Riano was driving; Perez and Diaz were passengers. They looked at the agents and then drove away. The agents then positioned their car to observe the house about one-half of a block away. The defendants drove around the block and again pulled up in front of the house, with the agents observing out of sight down the block. Riano got out of the car, opened the hood and trunk, and scanned the area while seemingly pretending to check the car. Perez went into the house, while Diaz was met at the door by a fourth man. Perez exited carrying a heavy cardboard box, which he put in the trunk of the Caprice. He then drove away with Riano. The agents followed them. Riano drove using "surveillance conscious" evasive procedures; he spoke on the car phone and constantly checked behind him as he circled and turned erratically. During their tail of the Caprice, the agents called for additional agents to observe the house.

After 45 minutes—at 11:30 a.m. or 12 noon—the defendants, followed by the agents, arrived at the Cue Variety Store on Roosevelt Avenue, approximately 10–15 minutes from the house if driven directly. Riano and Perez went in. Various people from the store, including two men known as Hugh Hunte and Mr. Rios, came to the door, looked around and then re-entered. By this time, there were four agents conducting surveillance at the Cue Variety Store, three on foot and one in the car.

Meanwhile, back at the house, two men came out, the first one driving away and the second one returning into the house. Then the second man came out again, looked around and went back in. Diaz then exited, carrying two large plastic bags that he placed in the trunk of a parked car. As he did so, he was approached by Agent Gerard McAleer, who looked in the open trunk at the open tops of the bags and saw a large quantity of cash. The agent arrested Diaz, searched him and found in his jacket three bundles of cash, each contain-

ing $10,000. The bags in the car held $28,000.

About one and one-half hours after they entered the Cue Variety Store—at approximately 1:30—Riano and Perez left and went to a card store. They purchased cards, and went to a public phone. Riano and Perez then went to a parking garage, where they met a third man, jump-started a 1982 Buick and drove away. The Caprice they had driven to the Cue Variety Store remained parked outside on Roosevelt Avenue. After Riano had driven about six blocks, the agents pulled the Buick over, identified themselves, and asked Riano for license and registration. Riano said, in English, that it was not his car and that he could not produce a license and registration. Riano presented a letter from the Cue Variety Store and various Immigration and Naturalization Service papers. Both defendants stated, in response to agents' inquiry, that they were in the United States illegally and had no papers. Riano said they had just come from the Cue Variety Store, where they had been for one and one-half hours. While the agents ran a license plate check, they were informed of Diaz' arrest and the seizure of the cash. They then arrested Riano and Perez and drove back to the house on 46–18 190th Street.

Suspecting that someone had the keys to the Caprice that Riano and Perez had driven from the house and had left outside the Cue Variety Store on Roosevelt Avenue, the agents then decided to search it. Before searching it, however, the agents asked local police to announce that all cars be moved from the block. No one moved the Caprice. A police officer then entered the store and asked whose car it was. No one in the store claimed it. The search of the Caprice revealed that the trunk contained the cardboard box that Perez had carried from the house. The trunk contained one million dollars in cash. In addition, a Customs Service receipt of seized assets was found in the car's glove compartment.

After observing the removal of the box from the house, and believing that the

fourth unidentified male Hispanic was in the house at the time, the agents decided to search the house immediately. The agents seized a red ledger book, plastic garbage bags, and tape similar to that used on the box with the money. All these items were in plain view. The house was furnished sparsely and contained large fans of a type often found in cocaine processing mills.

The agents also ran a check on the license plates of the Caprice, the Buick and the car in which Diaz was arrested. All three cars were registered to third parties.

## II. CONCLUSIONS OF LAW

### A. *Diaz*

■ Diaz argues that his post-arrest statements, the $58,000 in cash and personal papers taken from him after his arrest all must be suppressed as fruits of an illegal arrest. I disagree. Based on the facts described above, there was ample probable cause to arrest Diaz.

Based on the beeper calls, the surveillance, the information from the neighbors, the odd comings and goings, and the surveillance-conscious conduct of the occupants, the agents quite reasonably concluded that the house was the site of illicit activity. Diaz arrived at the house with the other surveillance-conscious defendants, who had removed something heavy from the house. After a lookout checked the area, Diaz emerged with two large bags. The officer reasonably thought that drugs, money or other evidence was being removed from the drug house. Under these circumstances, the investigatory stop was based on ample reasonable suspicion. *See Adams v. Williams*, 407 U.S. 143, 145–46, 92 S.Ct. 1921, 1923, 32 L.Ed.2d 612 (1972); *Terry v. Ohio*, 392 U.S. 1, 22–23, 88 S.Ct. 1868, 1880–81, 20 L.Ed.2d 889 (1968).

Once stopped, Diaz consented to the agent's inspection of the bags. There is no evidence of coercion or any lack of voluntariness. Even if Diaz had not consented, the large amounts of cash were in plain view through the open ends of the bags in the open trunk. *See Coolidge v. New Hampshire*, 403 U.S. 443, 465–74, 91 S.Ct. 2022, 2037–42, 29 L.Ed.2d 564 (1971). The discovery of the significant, unexplained wealth caused the officer's reasonable suspicion to ripen into probable cause to arrest.

Probable cause is "a practical, non-technical concept." *Illinois v. Gates*, 462 U.S. 213, 231, 103 S.Ct. 2317, 2328, 76 L.Ed.2d 527 (1983). To establish probable cause, one need not make "a prima facie showing of criminal activity" nor demonstrate that it is more probable than not that a crime has been or is being committed. *United States v. Travisano*, 724 F.2d 341, 346 (2d Cir.1983). Probable cause for arrest "exists where the facts and circumstances within [the officers'] knowledge and of which they had reasonably trustworthy information [are] sufficient in themselves to warrant a man of reasonable caution in the belief that an offense has been or is being committed." *Brinegar v. United States*, 338 U.S. 160, 175–76, 69 S.Ct. 1302, 1310–11, 93 L.Ed. 1879 (1949) (citations omitted).

*United States v. Ginsberg*, 758 F.2d 823, 828 (2d Cir.1985). I conclude that removal of a large quantity of cash from a drug processing laboratory by an individual wary of observation is sufficient to warrant reasonable belief that a crime has been committed. The arrest was lawful, and the motion to suppress its fruits therefore is denied.

### B. *Riano and Perez*

Riano and Perez also seek suppression of all fruits of what they allege to be an illegal arrest.

#### 1. Legality of the Arrest

■ Defendants Riano and Perez challenge their identification by the agents as the two who drove up to the variety store in the gray Caprice. They assert they were simply two citizens who left the store, went to a parking garage, jump-started their car, and got arrested. I am satisfied from the testimony at the hearing that the agents correctly identified Riano and Perez as the two men who had picked up the heavy box from the house and who had

tried to avoid surveillance. The agents had had ample opportunity to observe the defendants, from ranges that gave good views. Defendants, of course, are free to contest their identifications at trial.

The investigative stop of Riano and Perez is justified on the same basis as the stop of Diaz. In addition, the agents observed the evasive driving techniques on the trip to the variety store, the lookouts at the store, and the switching of the cars. These factors clearly establish a strong showing of reasonable suspicion. *See Terry v. Ohio, supra,* at 22, 88 S.Ct. at 1880; *United States v. Pinto–Mejia,* 720 F.2d 248, 262 (2d Cir.1983). Once the agents were informed, while the car was stopped, that the containers removed from the house by Diaz contained a great deal of cash, they certainly had probable cause to arrest Riano and Perez, who also had just removed a heavy container from the same house, the illicit nature of which was now confirmed. Based on these facts, I conclude that the arrest was legal. *See United States v. Medina–Gasca,* 739 F.2d 1451, 1453 (9th Cir.1984) ("Founded suspicion to stop for investigatory detention may ripen into probable cause to arrest through the occurrence of facts or incidents after the stop.").

2. Suppression of Evidence Seized from Chevrolet Caprice

■ Riano and Perez also seek suppression of the one million dollars seized from the box in the trunk of the gray Caprice parked in front of the variety store. It appears that neither defendant has standing to assert this claim. A defendant

> can demonstrate that his own legitimate expectation of privacy has been infringed by showing that he owns the premises or property subjected to search, *see Rakas v. Illinois,* [439 U.S. 128, 143 n. 12, 99 S.Ct. 421, 430 n. 12, 58 L.Ed.2d 387], or by showing that he occupies and has dominion and control over the premises or property by leave of the owner, *see Jones v. United States,* 362 U.S. 257, 267, 80 S.Ct. 725, 734, 4 L.Ed.2d 697 (1960) *overruled on other grounds, United States v. Salvucci,* 448 U.S. 83, 100 S.Ct. 2547, 65 L.Ed.2d 619 (1980).

On the other hand, a mere trespasser has no Fourth Amendment protection in premises he occupies wrongfully.

. . . . .

> Consistent with these parameters, we have held that where a defendant had the keys to a car and permission from the owner to use it he had standing to challenge the search of the car, *see United States v. Ochs,* 595 F.2d 1247, 1253 (2d Cir.), *cert. denied,* 444 U.S. 955, 100 S.Ct. 435, 62 L.Ed.2d 328 (1979); but where the car driven by one defendant with the other defendant as a passenger was registered in someone else's name, and neither defendant showed any legitimate basis for being in the car, neither had standing. *See United States v. Smith,* 621 F.2d 483 (2d Cir.1980).

*United States v. Sanchez,* 635 F.2d 47, 64 (2d Cir.1980) (footnote omitted).

Both Riano and Perez here claim that they were never in the Caprice and that they have been confused with the real culprits. This disclaimer of interest in the car divests defendants of the ability to claim an expectation of privacy in it. I have found that they were in it, however, so I shall consider the standing issue on that basis. The car here was registered to a third party. Thus, the defendants have no standing in the absence or showing of a legitimate basis—such as the owner's permission—for being in it. *See id.* No such showing has been made here.

■ Even assuming that Riano and Perez have standing, the search of the car was proper. Having seen the defendants take the box from the house and put it in the trunk of the car, and knowing that Diaz had taken from the same house bags containing a great deal of cash, the agents had probable cause to believe evidence of a crime would be found in the trunk. Under the automobile exception, *see Chambers v. Maroney,* 399 U.S. 42, 48, 90 S.Ct. 1975, 1979, 26 L.Ed.2d 419 (1970), no warrant was required. Once they had probable cause to search the trunk, they were permitted to open the container—the box—in the trunk. *See United States v. Ross,* 456

U.S. 798, 816–24, 102 S.Ct. 2157, 2168–73, 72 L.Ed.2d 572 (1982). This is not a case like *United States v. Chadwick*, 433 U.S. 1, 11–15, 97 S.Ct. 2476, 2483–86, 53 L.Ed.2d 538 (1977), or *Arkansas v. Sanders*, 442 U.S. 753, 763–65, 99 S.Ct. 2586, 2592–94, 61 L.Ed.2d 235 (1979), in which the automobile exception did not apply. *See Robbins v. California*, 453 U.S. 420, 435, 101 S.Ct. 2841, 2850, 69 L.Ed.2d 744 (1981). Here, the officers did not have probable cause to believe the box contained contraband until they received the news of Diaz' arrest and the seizure of the cash. They received this information well after the box had been placed in the car. Thus, the search of the car was proper and the evidence seized should not be suppressed.

### 3. Suppression of Evidence Seized from the Buick

■ As to the items taken from the Buick in which Riano and Perez were arrested, including the hardware, the jewelry boxes and the greeting cards, I find that they properly were seized incident to their arrest. These items were in the passenger compartment of the Buick and thus within the so-called grab area of the *Chimel* doctrine. "There is ample justification ... for a search of the arrestee's person and the area 'within his immediate control'—construing that phrase to mean the area from within which he might gain possession of a weapon or destructible evidence." *See Chimel v. California*, 395 U.S. 752, 763, 89 S.Ct. 2034, 2040, 23 L.Ed.2d 685 (1969).

### 4. Statements Made by Riano

■ In regard to the statements made by defendant Riano before his arrest in the Buick, I find that these statements must be suppressed because no *Miranda* warnings were given. Once the car was pulled over, the defendants remained seated in the car. As the lights flashed, the agents stood on either side of the car with their guns drawn, although remaining at their sides. Agent Torretta with commendable candor conceded that the defendants were not free to leave.

Given these circumstances, I find that the setting was custodial and, therefore, the *Miranda* warnings should have been given prior to any questioning. Therefore, the answers to the questions put at that scene must be suppressed. *See Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

### C. Search of the House

■ No defendant has established standing to challenge the search of the house. Diaz contends that he has standing on the ground that he legitimately was on the premises. He lived in the house for eight days, yet claimed that he was on the premises against his will. His standing, at best, is chimerical. In any event, the warrantless search of the house was justified by exigent circumstances. The defendants were in the process of removing evidence—vast sums of money, at least—from the premises. The prevention of the destruction of evidence justifies the warrantless search of the house. *See United States v. Karo*, 468 U.S. 705, 714–15, 104 S.Ct. 3296, 3302–03, 82 L.Ed.2d 530 (1984); *United States v. Gallo–Roman*, 816 F.2d 76, 79 (2d Cir.1987).

### D. Lost Evidence

■ I now come to the issue of the lost car phone. There had been reference made in the complaint to the defendant's use of a mobile car telephone. Defendant Riano maintains that he was not in the car with the mobile telephone and seeks the opportunity to demonstrate that the mobile telephone is linked to someone else. The mobile telephone has been lost and defendant Riano now asserts that as a result, dismissal penalties are appropriate.

*United States v. Bufalino*, 576 F.2d 446, 449 (2d Cir.), *cert. denied*, 439 U.S. 928, 99 S.Ct. 314, 58 L.Ed.2d 321 (1978) held that sanctions, dismissal, suppression, preclusion are proper where a government agent deliberately destroys material subject to discovery pursuant to Fed.R.Crim.P. 16 or 18 U.S.C. § 3500 unless the government proves no prejudice to the defendant.

The government has long been on notice of its duty to preserve discoverable evidence and has been repeatedly warned of the jeopardy in which it places its prosecutions when it disregards this obligation. However ... sanctions should not be imposed on the government for the loss of such material; rather, the appropriateness and extent of sanctions in such situations depends upon a case-by-case assessment of the government's culpability for the loss, together with a realistic appraisal of its significance when viewed in light of its nature, its bearing upon critical issues in the case and the strength of the government's untainted proof.

*United States v. Grammatikos,* 633 F.2d 1013, 1019–20 (2d Cir.1980).

This case is unlike most of the precedents, in which agents intentionally destroyed tapes or notes pursuant to an agency policy. Here, the government asserts it lost the car phone by accident. Moreover, even if it had been destroyed purposely, dismissal or preclusion would not be appropriate because the mobile telephone is an insignificant piece of evidence. *See United States v. Ammar,* 714 F.2d 238, 260 (3rd Cir.), *cert. denied,* 464 U.S. 963, 104 S.Ct. 344, 78 L.Ed.2d 311 (1983). Indeed, it borders on the cumulative, in light of the ample evidence produced establishing that the defendants were "surveillance conscious." In any event, it bears no direct relation to guilt or innocence. Dismissal of the indictment, therefore, is not warranted.

### E. *Miscellaneous Motions*

■ 1. Defendant Diaz also moves to strike paragraph three from the indictment. Diaz describes this portion of the indictment as stating that he furthered the alleged conspiracy through his silence. Diaz argues that such a comment on his silence violates due process and is impermissible. The indictment, however, charges simply that the defendants were members of a conspiracy and that one of the objects thereof was to conceal the cash proceeds of narcotics activities. Where, as here, there is evidence that defendants' efforts to evade detection were part and parcel of the criminal scheme, it is permissible to charge concealment as an objective. *See United States v. Potamitis,* 739 F.2d 784, 788 (2d Cir.), *cert. denied,* 469 U.S. 918, 105 S.Ct. 297, 83 L.Ed.2d 232 (1984); *United States v. Colasurdo,* 453 F.2d 585, 592–93 (2d Cir.1971), *cert. denied,* 406 U.S. 917, 92 S.Ct. 1766, 32 L.Ed.2d 116 (1972). Thus, Diaz's motion to strike paragraph three of the indictment is denied.

2. Riano and Perez also move to dismiss the indictment, arguing that the grand jury was not presented with evidence sufficient to establish their membership in the conspiracy. It is well settled that an indictment returned by a legally constituted grand jury, if valid on its face, is enough to call for trial on the merits. *See United States v. Calandra,* 414 U.S. 338, 345, 94 S.Ct. 613, 618, 38 L.Ed.2d 561 (1974); *Costello v. United States,* 350 U.S. 359, 363, 76 S.Ct. 406, 408, 100 L.Ed. 397 (1956). The defendants' speculation about what went on before the grand jury is insufficient to warrant inspection of the minutes. *See United States v. Wilson,* 565 F.Supp. 1416, 1436 (S.D.N.Y.1983). Indeed, even if the grand jury indicted on the basis of inadequate or incompetent evidence, dismissal is not warranted. *See Calandra, supra,* 414 U.S. at 345, 94 S.Ct. at 618; *United States v. Bertolotti,* 529 F.2d 149, 159 (2d Cir. 1975). The motion to dismiss the indictment therefore is denied.

■ 3. All of the defendants move for a bill of particulars. A bill of particulars has three purposes: to provide the defendant with a sufficient understanding of the charges so that he can prepare his defense; to avoid unfair surprise at trial; and to enable the defendant to raise a double jeopardy defense if subsequently prosecuted for the same offense. *See United States v. Shoher,* 555 F.Supp. 346, 349 (S.D.N.Y. 1983); *see also Wong Tai v. United States,* 273 U.S. 77, 82, 47 S.Ct. 300, 302, 71 L.Ed. 545 (1927) (bill of particulars appropriate where indictment is indefinite, where defendant may be subject to surprise during the course of trial or where defendant's substantial rights may be prejudiced).

Where "facts supplemental to those contained in the indictment ... are necessary to apprise the defendant of the charges against him with sufficient precision," *United States v. Persico,* 621 F.Supp. 842, 868 (S.D.N.Y.1985), a bill of particulars is appropriate.

The government is not required, however, to disclose its evidence, *United States v. Gottlieb,* 493 F.2d 987, 994 (2d Cir.1974), or its legal theory, *United States v. Leonelli,* 428 F.Supp. 880, 882 (S.D.N.Y.1977), or "the precise manner in which the crime ... is alleged to have been committed." *United States v. Andrews,* 381 F.2d 377, 377–78 (2d Cir.1967), *cert. denied,* 390 U.S. 960, 88 S.Ct. 1058, 19 L.Ed.2d 1156 (1968). A bill of particulars is not a general investigative tool for the defense. *See Persico, supra,* 621 F.Supp. at 868; *see also United States v. Salazar,* 485 F.2d 1272, 1278 (2d Cir.1973) ("principal function of a bill of particulars is to apprise a defendant of the essential facts of the crime for which he has been indicted"), *cert. denied,* 415 U.S. 985, 94 S.Ct. 1579, 39 L.Ed.2d 882 (1974). *See generally Shoher, supra,* 555 F.Supp. at 349–50 (defendant's request for particularization denied and characterized as improper attempt to uncover the theory and evidentiary details of the government's case).

Among the factors to be considered in determining whether particulars are warranted are "the complexity of the offense, the clarity of the indictment, and the degree of discovery otherwise available to the defendants". *Id.* at 349. Having reviewed defendants' requests in light of these principles, I conclude, with one exception, that particulars are unnecessary. The investigation in this case was not long, and the facts are not particularly complicated. The complaint is detailed, the indictment is straightforward, and discovery materials have been provided. Defendants thus are amply equipped to prepare for trial. The government, however, will be required to supply defendants with a list of any unindicted co-conspirators. *See United States v. Mannino,* 480 F.Supp. 1182, 1185 (S.D.N.Y.1979).

 4. Riano and Perez also seek disclosure of the government's witnesses.

Under *United States v. Cannone,* 528 F.2d 296, 301 (2d Cir.1975), the government's reasons for preventing disclosure of the information must be weighed against defendants' specific showing of a need for disclosure. The defendants here have not met the standard of demonstrating that disclosure is both material to their defense and reasonable under the circumstances. *See id.* at 301–02. The mere assertion that the witness list will facilitate trial preparation is insufficient. *See United States v. Pastor,* 419 F.Supp. 1318, 1330 (S.D.N.Y. 1975). The defendants here have alleged no more than that. The motion to disclose the government's witnesses therefore is denied.

5. Finally, Riano and Perez seek a severance from Diaz on the ground that Diaz told agents that he did not know Riano and Perez and that they were not at the house. If this is exculpatory material, then the government must then turn it over. *See Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). In any event, there is no reason to believe that a severance is required. If Diaz in fact did make an exculpatory statement, the agent who heard that statement can be put on the stand at trial and the testimony can be elicited.

There being no other grounds raised for severance, the interests of justice and judicial efficiency suggest that if any case should be tried jointly, it is this case involving these three defendants. The motion for severance accordingly is denied.

## CONCLUSION

Defendant Riano's motion to suppress his statements made prior to arrest and without proper *Miranda* warnings is granted. In addition, the Government will supply defendants with a list of all unindicted co-conspirators. All other motions made by the defendants are denied.

SO ORDERED.